# Exhibit D

# LICENSE AGREEMENT

AGREEMENT made effective as of the 15th day of March, 2003 by and between PEZ Candy, Inc., a corporation of the State of New York, with its principal place of business at 35 Prindle Hill Road, Orange, Connecticut 06477 (hereinafter referred to as "LICENSOR") and Playing Mantis, Inc., a corporation of the State of Indiana with its place of business at 3618 Grape Road, Mishawaka, IN 46545 (hereinafter referred to as "LICENSEE").

WHEREAS, LICENSOR has the right to license the property from the OWNER (Patrafico AG) of certain proprietary intellectual property, including but not limited, to trademarks, logos, designs, copyrights and other similar materials (the "Property") used in connection with the brands set forth on Schedule A of this agreement; and

WHEREAS, LICENSEE desires to obtain the right and license to use the Property on and in connection with the manufacture, distribution and sale of Licensed Product(s) in the territory (both as hereinafter defined) and LICENSOR is willing to grant LICENSEE such right and license.

NOW THEREFORE, in consideration of the premises and mutual covenants, conditions and agreements herein contained, the parties agree as follows:

## GRANT OF LICENSE

1.1 Grant. LICENSOR hereby grants to LICENSEE, and LICENSEE hereby accepts upon the terms and conditions herein, the non-exclusive right and license to utilize the Property in the Territory solely upon and in connection with the manufacture, distribution and sale of the products shown on Schedule B hereof (the "Licensed Product(s)"). In the event of any question about whether any specific product or products are Licensed Products, the determination of LICENSOR shall be conclusive.

1.2 Retail Condition of Licensed Products. The Licensed Products manufactured under this License shall be placed in distribution by the LICENSEE in a fully finished condition for immediate or eventual sale at the retail level in that same condition and for the use approved by LICENSOR, and in no event shall the Licensed Products be sold to any party if the LICENSEE knows, or should have known, that the Licensed Products will be thereafter altered, modified, re-packaged, filled, made part of something else or used in any other unauthorized manner by any party in the chain of distribution.

1.3   Reservation of Rights.

(a)     LICENSOR retains all rights not expressly and exclusively conveyed to LICENSEE hereunder, and it is acknowledged that LICENSOR may grant licenses to others to use the Property in connection with other products.

(b)     LICENSOR reserves the right to itself use, manufacture, distribute and sell or have others manufacture for it, the same type of product as a premium. In the event, however, that LICENSEE acts as a supplier of premium or promotional Licensed Products to LICENSOR or any parties authorized by LICENSOR, such sales shall be subject to the provisions of no. 4.1 of this Agreement regarding Royalties.

(c)     From time to time, opportunities of a short term nature may arise using a particular new application of the Property wherein LICENSOR will ask LICENSEE to produce on an expedited basis Licensed Products either for LICENSOR to use for premium or promotional purposes or to be sold by LICENSEE at retail, or both, and if LICENSEE is unable or unwilling to so produce such Licensed Products within time frames acceptable to LICENSOR as well as meeting LICENSOR'S other reasonable requisites under the circumstances, such as sufficient distribution capability and appropriate price and quality, LICENSOR shall have the right to seek and license other parties for this limited opportunity only.

(d)     If LICENSOR becomes aware of the inability or unwillingness of LICENSEE to fill an order for Licensed Products by itself or any customer, LICENSOR shall have the right to seek and license another party or parties to fill said order(s).

1.4   No Right to Sub-License.  LICENSEE shall not be entitled to sublicense any of its rights under this Agreement.  In the event Licensee is not the manufacturer of the Licensed Products, Licensee shall be entitled to utilize a third party manufacturer in connection with the manufacture and production of the Licensed Products, provided that such manufacturer shall execute a letter in the form of Exhibit B attached hereto and by this reference made a part hereof.  In such event, Licensee shall remain primarily obligated under all of the provisions of this Agreement and any default of this Agreement by such manufacturer shall be deemed a default by Licensee hereunder.  In no event shall any such third party manufacturer agreement include the right to grant any rights to subcontractors.

## TERRITORY

2.     The rights of distribution and sale granted to LICENSEE under this Agreement shall be limited to those jurisdictions set forth on Schedule C hereto and LICENSEE agrees that it will not make or authorize any use, direct or indirect, in any other area and that it will not knowingly sell Licensed Products to persons who intend, or are likely, to resell them in any other area.

## TERM

3.1 <u>Term</u>.  The initial term of this Agreement shall be a period of three (3) years and nine months, commencing on April 1, 2003 and terminating on December 31, 2006 unless sooner terminated in accordance with the provisions of this Agreement.

3.2     <u>Renewal.</u>  In the event this Agreement has not been terminated and LICENSEE has faithfully performed each and every obligation of this Agreement during the initial term referred to in 3.1, LICENSOR agrees to negotiate in good faith with LICENSEE with respect to a renewal period of the Term for such period of time and upon such terms and conditions as the parties may mutually agree.  (The defined term "Term" as used herein shall include any renewals thereof.)

## CONSIDERATION AND RELATED LICENSEE OBLIGATIONS

4.1     <u>Royalties</u>. (a)  In consideration of the right and license herein granted, LICENSEE shall pay to LICENSOR a sum ("Royalties") equal to eight percent (8%) of all Net Sales (as defined below) by or on behalf of LICENSEE of the Licensed Products or ten percent (10%) of your Net Invoices Billings to authorized customers when your customer located in the Territory bears the costs (e.g. shipping, duties, and the like) of obtaining delivery in the Territory of Products manufactured outside the Territory ("F.O.B."). Royalties shall accrue when the Licensed Products are invoiced or shipped, whichever occurs first, and shall be payable concurrently with the periodic statements required in no. 6 herein. The term "Net Sales" shall mean the gross invoice price billed customers less customary trade discounts, rebates, returns actually credited, and charged to and paid by the customer, but with no other deductions of any kind whatsoever, provided, however, that if LICENSEE sells Licensed Products to a party owned, in whole or in part, or controlled by, or related to, the LICENSEE, the invoice price used to determine Net Sales shall be based on the invoice price at which the

Licensed Products are re-sold by the related party to an unrelated customer in an arms-length transaction.

      (b) Royalties or any other payments due to Licensor hereunder which are received after the due date shall bear interest at the rate of 18% per annum from the due date (or the maximum permissible by law if less that 18%).

    4.2  <u>Advance</u>.  LICENSEE agrees to pay LICENSOR the sum of $10,000 upon execution of this Agreement which shall be deemed to be a non-refundable advance against Royalties due.

    4.3  <u>Guaranteed Minimum Royalties</u>.  LICENSEE agrees that, notwithstanding the actual amount of Net Sales, it shall be obliged to make certain minimum payments each period as set forth below to LICENSOR ("Guaranteed Minimum Royalties").  Until the period total is reached, for each quarter LICENSEE shall pay the greater of the actual Royalties owed under no. 4.1 or the Guaranteed Minimum Royalties as follows:

Total Guaranteed Minimum Royalties: $20,000

$10,000 payable under 4.2
$5,000 due 3/15/04
$5,000 due 3/15/05

    4.4  <u>Guaranteed Minimum Shipments</u>.  Notwithstanding anything
to the contrary set forth herein, LICENSEE shall maintain minimum net shipments of Licensed Products sold and shipped in an aggregate amount corresponding to the following Net Sales:

100 units

    4.5  <u>First Shipment Date</u>.  LICENSEE agrees it will commence distribution of Licensed Products in reasonable quantities through customary channels of trade no later than June 1, 2004.  If this does not occur, this Agreement will automatically terminate but LICENSEE shall forfeit the advance payment of no. 4.2.

REPRESENTATIVE

    5.  From time to time, LICENSOR may designate one or more representative ("Representative") upon notice to LICENSEE, to generally act on behalf of LICENSOR sometimes in conjunction with LICENSOR and sometimes in its place and stead, such as, but not limited to, receiving payments, made payable to LICENSOR unless otherwise specified, and statements as set forth in no. 6 and performing the various quality control functions as set forth in no. 7.  In the event such a Representative is designated, all references to administrative duties of the LICENSOR in this Agreement

may be construed as referring to the Representative if appropriate to carry out the purposes of this Agreement.  LICENSOR agrees that it will be bound by any communications or representations of its Representative and cannot repudiate same. LICENSOR, at its complete discretion, may replace a Representative, upon written notice to LICENSEE, without affecting the validity of this Agreement.

## STATEMENTS, PAYMENTS AND RECORDS

6.1   Statements.  Within thirty days of the end of each calendar quarter during the term hereof, commencing with the calendar quarter beginning April 1, 2003 LICENSEE shall deliver to LICENSOR, or its Representative if so specified, a complete and accurate statement, in the format set forth in Exhibit A, certified to be accurate by LICENSEE (if LICENSEE is a corporation, by an officer or authorized person of LICENSEE), setting forth:

(a)   LICENSEE'S net shipments, by number of each Licensed Product, reported separately, for the preceding calendar quarter;

(b)   LICENSEE'S Net Sales for each Licensed Product, reported separately, for the preceding calendar quarter;

(c)   a computation of Royalties due, taking into account any Guaranteed Minimum Royalties which may be due to the extent that the Guaranteed Minimum Royalties for the preceding calendar quarter exceed earned Royalties.

(d)   LICENSEE shall report and specify for each country (U.S.A. and Canada) the list of all Products, Net Shipments, Net Sales, Total Net Sales, and Combined Net Sales for all territories listed on Exhibit A.

Such statements shall be furnished to LICENSOR whether or not any of the Licensed Products have been shipped during the period.

6.2   Payments.    Each statement delivered pursuant to no. 6.1 shall be accompanied by a check payable to LICENSOR or other party specified by LICENSOR in full payment of any Royalties or other payments due for the period.

6.3   Records.   LICENSEE shall keep, maintain and preserve in LICENSEE'S principal place of business during the term of this Agreement and for at least two (2) years following expiration or termination of this Agreement or any renewals, complete and accurate records and accounts covering all transactions relating to this Agreement

including, without limitation, invoices, correspondence, banking, financial and all other pertinent records and accounts. Such records and accounts shall be maintained in accordance with generally accepted accounting procedures and principles and shall be available for inspection and audit at LICENSOR'S expense at any time or times during the term of this Agreement, any renewal hereof and for two (2) years thereafter, during reasonable business hours and upon reasonable notice by LICENSOR or its nominees. LICENSEE agrees not to cause or permit any interference with LICENSOR or nominees of LICENSOR in the performance of their duties of inspection and audit. In the event any errors or discrepancies are discovered in any records, statements or accounts or in payments resulting therefrom, they shall immediately be rectified and the appropriate payments made by LICENSEE, together with interest at the then Citibank, N.A. prime rate per annum from the date the payment was originally due. Should any willful errors or discrepancies be disclosed as a result of the inspection or audit or otherwise, then in addition to all other relief to which LICENSOR may be entitled, including the right to immediately terminate this Agreement, LICENSEE shall promptly reimburse LICENSOR for the full cost of such inspection and audit, together with interest at the then prime rate per annum for any additional monies found to be due as a result of the inspection or audit compounded from the date the payment was originally due.

6.4 Right to Dispute Records. Receipt or acceptance by LICENSOR of any of the statements furnished pursuant to this Agreement, the exercise by LICENSOR in whole or in part at any time or times of the right to audit and inspect records and accounts, or the receipt or deposit by LICENSOR of any payment tendered by or on behalf of LICENSEE shall be without prejudice to any rights or remedies of LICENSOR and shall not prevent LICENSOR from thereafter disputing the accuracy of any such statements, payments, records, and accounts.

## QUALITY STANDARDS AND CONTROL

7.1 Quality Standards. All Licensed Products and related materials, displaying the Property, such as, but not limited to, containers, packaging, wrapping materials, labels, hang tags, advertising materials, promotional materials, catalogs, artwork, and other pictorial and textual materials to be used in connection with the Licensed Products, (collectively the "Licensed Products/Materials") must meet the standards of nature and quality prescribed by LICENSOR. All Licensed Products/Materials shall be of high standards and of such quality as will, in LICENSOR'S sole judgment, protect and enhance the Property and the substantial good will pertaining thereto, and in all cases the quality shall be substantially the same quality of samples approved by LICENSOR.

7.2 <u>Control</u>. LICENSEE shall insure at all times that the Licensed Products/Materials meet in fact LICENSOR'S standards of nature and quality and LICENSEE shall cooperate fully in all reasonable ways with LICENSOR in enabling LICENSOR to ascertain that all Licensed Products/Materials meet said standards. By way of example rather than limitation, LICENSEE shall:

(a)     permit, upon reasonable advance notice, LICENSOR or its Representative to visit during regular working hours LICENSEE'S premises where Licensed Products/Materials are manufactured, packaged, sold or distributed for the purpose of inspection of the manufacturing process and related activities; and

(b)     upon request of LICENSOR or its Representative, send to LICENSOR or its Representative reasonable quantities of samples of Licensed Products/Materials, at LICENSEE'S expense, for the purpose of testing, inspection and review.

7.3 <u>Prior Approval</u>. No Licensed Product shall be manufactured, distributed, sold or used by LICENSEE prior to LICENSOR'S written approval of final production samples of each Licensed Product/Material including packaging, displays, advertising, websites, and promotional materials. Further written approval will be necessary if there is any change proposed by LICENSOR or LICENSEE in type, style, model, grade, description or the like from any previously approved Licensed Products/Materials including packaging.     LICENSOR's Representative will notify LICENSEE of LICENSOR'S approval or disapproval. Licensed Products/Materials shall not be manufactured, distributed, sold or used without final written approval from Licensor or which differ from the approved samples.     Failure to comply with this paragraph will result in immediate termination without recourse.

7.4 <u>Deficiency</u>. Promptly upon receipt from LICENSOR or its Representative of information or notice that any Licensed Products/Materials manufactured, sold or used by Licensee does not or has not met the specifications or standards of nature and quality prescribed by LICENSOR, LICENSEE shall correct such deficiency forthwith at LICENSEE'S expense.     LICENSEE shall thereupon submit samples of the corrected Licensed Products/Materials pursuant to no. 7.3, for approval.     In the event the deficiency is that of substandard Licensed Product or that of material mis-use of the Property, all existing inventory or work in progress of Licensed Products/Materials containing the deficiency shall, at LICENSEE'S expense, either be corrected to LICENSOR'S satisfaction or shall be destroyed. If the deficiency is deemed hazardous or defective Licensed Product, LICENSOR may require LICENSEE to effect a product recall, at LICENSEE'S expense. Notwithstanding the foregoing, such deficiencies may also subject LICENSEE to the provisions of no. 10.

7.5 <u>Applicable Laws and Standards.</u> (a) LICENSEE agrees that each Licensed Product and component thereof distributed hereunder shall be of good quality and free of defects in design, materials and workmanship, and shall comply with all applicable Laws, and such specifications, if any as may have been specified in connection with this Agreement and shall conform to the sample thereof approved by LICENSOR.

(b) Without limiting the foregoing, Licensee agrees on behalf of Licensee's own company, and on behalf of all of Licensee's third-party manufacturers and suppliers (collectively, "Manufactures"), as follows:

(c) LICENSEE and the Manufacturers agree not to use child labor in the manufacturing, packaging or distribution of LICENSOR'S licensed products. The term "child" refers to a person younger than the age for completing compulsory education, but in no case shall any child younger than fourteen (14) years of age be employed in the manufacturing, packaging or distribution of Licensed Products.

(i) LICENSEE and the Manufacturers agree to provide employees with a safe and healthy workplace in compliance with all applicable Laws. LICENSEE and the Manufacturers agree to provide Licensor with all information LICENSOR may request about manufacturing, packaging and distribution facilities for the Licensed Products.

(ii) LICENSEE and the Manufacturers agree only to employ persons whose presence is voluntary. LICENSEE and the Manufacturers agree not to use prison labor, or to use corporal punishment or other forms of mental or physical coercion as a form of discipline of employees.

(iii) LICENSEE and the Manufacturers agree to comply with all applicable wage and hour Laws, including minimum wage, overtime, and maximum hours. LICENSEE and the Manufacturers agree to utilize fair employment practices as defined by applicable Laws.

(iv) LICENSEE and the Manufacturers agree not to discriminate in hiring and employment practices on grounds of race, religion, national origin, political affiliation, sexual preference, or gender.

(v) LICENSEE and the Manufacturers agree to comply with all applicable environmental Laws.

(vi)   LICENSEE and the Manufacturers agree to comply with all applicable Laws pertaining to the manufacture, pricing, sale and distribution of the Licensed Products.

(vii)   LICENSEE and the Manufacturers agree that LICENSOR may engage in activities such as unannounced on-site inspections of manufacturing, packaging and distribution facilities in order to monitor compliance with applicable Laws.

(d)   Both before and after LICENSEE puts Licensed Products on the market, LICENSEE shall follow reasonable and proper procedures for testing that Licensed Products comply with all applicable Laws, and shall permit LICENSOR'S designees to inspect testing, manufacturing and quality control records and procedures and to test the Licensed Products for compliance.   LICENSEE agrees to promptly reimburse LICENSOR for the reasonable costs of such testing.   LICENSEE shall also give due consideration to any recommendations by LICENSOR that Licensed Products exceed the requirements of applicable Laws.   Licensed Products not manufactured, packaged or distributed in accordance with applicable Laws shall be deemed unapproved, even if previously approved by LICENSOR, and shall not be shipped unless and until they have been brought into full compliance therewith.

THE PROPERTY

8.1   Ownership.   (a) LICENSEE shall use the Property only in connection with the Licensed Products and agrees that all of LICENSEE'S use under this Agreement inures to the benefit of OWNER/LICENSOR.   LICENSEE acknowledges that OWNER/LICENSOR is the owner of the Property and the goodwill associated therewith and the Property is valid.     LICENSEE agrees not to contest OWNER'S/LICENSOR'S ownership or the validity of the Property during or after the term or any renewals.   Apart from the right of LICENSEE to use the Property pursuant to this Agreement, LICENSEE shall acquire no right, title or interest of any kind or nature whatsoever in or to the Property or the goodwill associated therewith.

(b) LICENSEE agrees to include LICENSOR'S website (www:pez.com) on their licensed product and packaging materials.   If LICENSEE cannot include the website on the licensed product and packaging, they must notify LICENSOR in writing the reasons why they cannot include LICENSOR'S website on the Licensed product and packaging.

8.2   Approval.   (a)  LICENSEE shall use the Property only in such form and manner as is specifically approved in writing by LICENSOR and, upon request by LICENSOR, affix thereto any legends, markings and notices of trademark registration or OWNER/LICENSOR-LICENSEE relationship specified by LICENSOR, or any other notice of OWNER/LICENSOR'S ownership, including copyright.   LICENSOR shall have

the right to approve all packaging, advertising, displays and selling materials using the Property prepared by LICENSEE. LICENSEE agrees to follow LICENSOR'S instructions and guidelines regarding proper usage of the Property in all respects.

(b)     LICENSEE'S name, trade name (or LICENSEE'S trademark which LICENSEE has advised LICENSOR in writing that LICENSEE is using) and LICENSEE'S address (city and state) will appear on permanently affixed labeling on each Licensed Product and additionally, if the Licensed Product is sold to the public in packaging or a container, printed on such packaging or a container so that the public can identify the supplier of the Licensed Product.  On soft goods "permanently affixed" shall mean sewn on. RN numbers do not constitute a sufficient label under this paragraph.

(c)     LICENSEE    shall advise LICENSOR in writing of all trade names or trademarks Licensee wishes to use on Licensed Products being sold under this license. LICENSEE may sell the Licensed Products only under mutually agreed upon trade names or trademarks.

(d) LICENSEE agrees to deliver to LICENSOR upon final approval of Licensed Products free of cost, twelve (12) of each of the Licensed Product(s) together with their packaging and wrapping material for trademark registration purposes in compliance with applicable laws.  Any copyrights or trademarks with respect to the Licensed Products shall be procured by and for the benefit of OWNER and at OWNER'S expense.  LICENSEE further agrees to provide LICENSOR with the date of the first use of the Licensed Product(s) in interstate and intrastate commerce.

8.3  LICENSEE Contributions.  LICENSEE agrees that all artwork, graphics, layouts, slogans, names, titles or similar materials incorporating, or being used in association with, the Property which may be created by the LICENSEE or its subcontractors pursuant to this License shall become the sole property of OWNER including copyright rights and LICENSEE agrees on behalf of itself, its employees, its subcontractors and any other party with whom it may contract to create such materials, to promptly execute any and all appropriate documents in this regard.

8.4  Protection and Defense.  LICENSOR agrees to protect and defend the Property at its sole cost and expense.  LICENSOR agrees to indemnify and hold LICENSEE harmless from any and all claims, liabilities, damages, costs or expenses arising out of, or resulting from, the proper use of the Property by LICENSEE pursuant to this Agreement, provided that LICENSEE shall cooperate fully with LICENSOR in the defense and protection of the Property and shall promptly advise LICENSOR in writing of any potentially infringing uses by others in addition to any suits brought, or claims made, against LICENSEE involving the Property.  Decisions involving the protection and defense of the Property shall be solely in the discretion of LICENSOR; LICENSEE

shall take no actions in this regard without the express written permission of LICENSOR.

8.5   Restrictions On Other Marks and Trade Names.   During or after the term including any renewals, LICENSEE shall not use any other trademarks or other property similar to the Property.  During or after the term, including any renewals, LICENSEE shall not use or register, in whole or in part, the Property or LICENSOR'S/OWNER'S name, or anything similar thereto, as part of LICENSEE'S name or as the name of any entity directly or indirectly associated with LICENSEE'S activities.

8.6   Changes to Property.   LICENSOR shall have the right at any time, upon notice, to make additions to, deletions from, and changes in the Property at its complete discretion, and LICENSEE shall adopt and use any and all such additions, deletions and changes as soon as practicable in all new production of the Licensed Products/Materials.

8.7   Termination.   Immediately upon termination or expiration of this Agreement, subject to the provisions of no. 10, LICENSEE shall immediately cease all use of the Property and all rights granted LICENSEE hereunder shall revert to LICENSOR.

## LICENSEE RIGHTS AND OBLIGATIONS

9.1   Subcontracting.   LICENSEE shall have the right to subcontract for the manufacture and production of the Licensed Product/Materials provided however, that, irrespective of, or in addition to any other agreements between LICENSEE and a subcontractor, LICENSEE agrees that any such subcontractor shall:

(i)   be fully subject to, and bound by, every provision of this Agreement;

(ii)   be made aware that it may not sell any Licensed Products manufactured by it to anyone but LICENSEE;

(iii)   agree that any related designs, labels, packaging or other materials incorporating or associated with the Property shall become the property of OWNER and that LICENSEE shall be responsible for obtaining any relevant supporting legal documentation; and

further provided that:

(iv)  a breach by a subcontractor of any provision of this Agreement shall be considered a breach by LICENSEE; and

(v)  LICENSEE shall remain primarily and completely obligated under all of the provisions of this Agreement.

9.2  <u>Marketing Continuity</u>.

(a)  LICENSEE shall use its best efforts to continuously design, manufacture, advertise, sell and ship all of the Licensed Products in all of the Territory in commercially reasonable quantities and shall continuously and diligently during the Term produce an inventory of Licensed Products and procure and maintain facilities and trained personnel sufficient and adequate to accomplish the foregoing.

(b)  Failure to comply with any of the foregoing in (a) may result in removal from this License of one or more of the unused or unexploited brands, Licensed Products or Territories set forth on Schedules A, B or C, upon written notice from LICENSOR.

(c)  LICENSEE shall not during the Term enter into a license agreement for products similar to Licensed Products with any competitor of LICENSOR'S/OWNER'S brands set forth in Schedule A.

9.3  <u>Patent Protection.</u>  (a) LICENSEE agrees to use its best efforts, at its own expense, to obtain patent protection for all newly developed candy dispenser devices, mechanisms and technologies for use on Licensed Products.  Upon termination or expiration of this Agreement, all patent rights obtained by LICENSEE pursuant to the terms of this Agreement will be assigned to LICENSOR.

(b)  In the event Licensee does not obtain said patent protection, upon the expiration or termination of this Agreement LICENSOR shall have the right to the continued use of the newly developed devices, mechanisms and technologies, in connection with its products.

9.4  <u>Compliance with Laws</u>.  LICENSEE warrants and represents that it will comply with all laws, regulations, ordinance, governmental standards and the like applicable to the manufacture, sale, distribution, promotion and advertisement of the Licensed Products and agrees to indemnify and hold LICENSOR harmless in this regard.

9.5   Goodwill.  LICENSEE acknowledges the tremendous value and goodwill of the Property accruing solely to OWNER/LICENSOR and agrees not to use the Property in any manner which may, in OWNER'S/LICENSOR'S judgment, be in bad taste, be inconsistent with OWNER'S/LICENSOR'S public image or which may in any way disparage OWNER/LICENSOR or its reputation, including, but not limited to, types and placement of advertising and types of channels of distribution, nor take any action which will harm or jeopardize the Property or OWNER'S/LICENSOR'S ownership thereof, in any way.

9.6   Confidentiality.  During the Term and thereafter, LICENSEE shall keep confidential any of LICENSOR'S confidential proprietary information, knowledge or trade secrets, such as but not limited to, marketing and advertising plans, licensing plans, market research data and the like, or which it becomes aware during the course of its relationship with LICENSOR.  If LICENSEE is uncertain about the status of a particular piece of information, it shall consult with LICENSOR to determine such status. This confidentiality obligation shall cease when the information becomes generally known to the public.

9.7   Indemnification.  LICENSEE agrees to assume the defense of, and to indemnify and hold OWNER/LICENSOR, its subsidiaries, affiliates, franchisees, successors and assigns harmless from any and all liabilities, damages, claims, judgments, awards, fines, penalties, or other payments (including reasonable fees), which may be incurred by any or all of them arising out of any claims or suits which may be brought or made against OWNER/LICENSOR or those in privity with OWNER/LICENSOR, excepting those arising directly and solely from the use of the Property, for injuries resulting from LICENSEE'S manufacture, advertising, packaging, labeling, promotion, sale, distribution or use of the Licensed Products, or any unauthorized use by LICENSEE of the Property or out of breach by LICENSEE of any provisions of this Agreement, provided OWNER/LICENSOR shall give prompt notice and reasonable cooperation and assistance to LICENSEE relative to any such claim or suit brought to its attention.  This provision shall survive indefinitely the termination or expiration of this Agreement.

9.8   Insurance.  LICENSEE agrees to obtain and keep in force, at its own expense, product liability insurance with respect to the Licensed Products, with a thirty (30) day notice of cancellation provision, from a recognized and responsible insurance company authorized to conduct an insurance business in New York with an A.M. Best Company rating of no less than A-XII.   Such insurance company shall name OWNER and LICENSOR, officers and affiliates of both companies as an additional insured, and provide protection in the amount of at least $3,000,000.00.  LICENSEE shall, within thirty (30) days from the date hereof, submit to LICENSOR a copy of such insurance

policy or a copy of a fully paid certificate of insurance therefor. Maintenance of such insurance and performance of LICENSEE of its obligations hereunder shall not relieve LICENSEE of liability under the indemnity contained in no. 9.7. LICENSEE agrees to maintain such product liability insurance for a period coextensive with that for which indemnification might be required under the provisions of this Agreement and in no event less than five (5) years beyond termination of this Agreement.

## TERMINATION

10.1    <u>Default</u>. LICENSOR shall have the right to terminate this Agreement without prejudice to any other rights which it may have if:

(a)    LICENSEE defaults in the performance of any of its obligations, representations or warranties provided for in this Agreement; or

(b)    any court, arbitration panel, government agency or body finds that the Licensed Products manufactured by LICENSEE are defective in any way, manner or form; or

(c)    the LICENSEE shall be unable to pay its debts when due, or shall make any assignment for the benefit of creditors, or shall file any petition under the bankruptcy or insolvency laws of any jurisdiction, country or place, or shall have or suffer a receiver or trustee to be appointed for its business or property, or be adjudicated a bankrupt or an insolvent; or

(d)    a subcontractor engages in conduct which, if engaged in by LICENSEE, would entitle LICENSOR to terminate this Agreement. However, LICENSOR will endeavor to discuss with LICENSEE what action LICENSEE must take or cause to be taken to remedy any damages to LICENSOR resulting from such a subcontractor's conduct. The nature and extent of the action to be taken shall be at LICENSOR'S sole and absolute discretion.

(e)    LICENSEE shall not have the right to sell the Licensed Products, to negotiate a license for the Licensed Products with or show the Licensed Products (including but not limited to prototypes, salespeople's samples, finished products, product photographs, product catalogs, and other collateral selling materials) to any entity outside of the United States unless such territories are listed on "Schedule C" of this License Agreement. If LICENSEE knowingly sells the Licensed Products outside of the United States, negotiates a license with or shows the Licensed Products (including but not limited to prototypes, salespeople's samples, finished products, product photographs, product catalogs and other collateral selling materials) to another entity outside of the United States (with the exception of territories listed on Schedule C")

without the written permission of the LICENSOR, this License Agreement will be immediately terminated without recourse.

(f)     LICENSEE shall not have the right to sell licensed products to retail catalogs or on-line web site candy buyers or buyers that purchase candy and other non-candy items for their section of the store, catalog or web site that contains candy and non-candy items such as but not limited to front end buyers and gift store buyers, catalog buyers, on-line web site buyers or allow the product to be sold in any section that contains candy with or without other non-candy items in any class of trade. If the product is sold to candy buyers or buyers that purchase candy and other non-candy items for their section of the store, catalog or on-line web site that contains candy and non-candy items such as but not limited to front end buyers and gift store buyers or is found in any section that contains candy with or without non-candy items in any class of trade, this License Agreement will be immediately terminated.

(g)     Licensor will have at its sole discretion, the right to purchase the licensed product from the licensee to sell to candy buyers or buyers who purchase candy as well as other non-candy items for their section of the store that contains candy and non-candy items in all classes of trade. Licensee agrees to sell the licensed product to licensor at a reasonable price which will allow the licensor to make a reasonable profit margin on the sale of the product while also allowing the licensor to sell the licensed product to their customers at the same published wholesale price that the licensee offers the product to the licensees' customers. Royalties will not be charged for the sale of the product from the licensee to the licensor.

10.2     Notice of Termination and Right of Correction.   In the event any of these defaults occur, LICENSOR shall give notice of termination in writing to LICENSEE by registered or certified mail.   Subject to the provisions of no. 10.3 and excepting a default in any payment due hereunder which must be corrected within ten (10) days of receipt of the notice and can only be corrected by payment, the LICENSEE shall have twenty (20) days after the receipt of notice in which to correct any of these defaults or to assure to LICENSOR'S satisfaction that appropriate corrective measures are being taken, and failing such, this Agreement shall terminate, and any and all payments then or later due from LICENSEE, including Guaranteed Minimum Royalties, shall then be promptly due and payable and no portion of prior payments shall be repayable to LICENSEE.   For the purposes hereof, the cessation by LICENSEE of all sales and distribution of the Licensed Products which shall have given rise to a default hereunder shall be deemed a correction of such default.

10.3     Exception to Right of Correction.   Notwithstanding the provisions of no. 10.2, LICENSEE shall have no right of correction in the event:

(a)  of willful errors or discrepancies in LICENSEE'S records as referred to in no. 6.3;

(b)  statements or payments as set forth in no. 6.1 and 6.2 are late more than twice in any year during the Term;

(c)  of the occurrence of the same default, other than concerning statements or payments under no. 6.1 or 6.2. more than twice during the Term or during any renewal period;

(d)  of default of the provisions of any provision covering a First Shipment Date obligation.

(e)  of willful acts or knowledge of activities in LICENSEES performance, conduct or actions under provision in no. 10.1.

10.4  <u>Right of Disposal</u>.

(a)  LICENSEE shall within thirty (30) days after termination or expiration, deliver to LICENSOR a final statement certifying the number and description of Licensed Products on hand or in process of manufacture.  LICENSOR shall also have the right to conduct a physical inventory in order to ascertain such inventory or verify such statement.

(b)  Subject to the provisions of no. 10.5, after expiration or termination of the Agreement, provided all sums due LICENSOR have first been paid, and statements due are furnished, LICENSEE may sell off of the Licensed Products covered by this Agreement which are in LICENSEE'S inventory or in process of manufacture at the time of expiration or termination for a period of ninety (90) days after said expiration or termination; provided further that all Royalties with respect to that sell off period are paid and statements therefor are furnished in accordance with the terms of this Agreement.  If the Licensed Products are not sold off after the ninety (90) day sell-off period, at LICENSORS option LICENSEE will either destroy the Licensed Products provide LICENSOR with an affidavit of such destruction or sell the remaining Licensed Products to LICENSOR at the LICENSEES cost (not including overhead) to manufacture the Licensed Products.

(c )  In recognition of LICENSORS interest in maintaining a stable and viable market for the Licensed products during and after the principle term and any sell-off period, LICENSEE agrees to refrain from "dumping" the Licensed Products in the market during any sell-off period granted to LICENSEE.  Dumping shall mean the distribution of the Licensed Products at volumes significantly above LICENSEE'S prior

sales practices with respect to the Licensed Products, and at prices below the regular published wholesale price of the Licensed Products during the term of this Agreement.

(d)   Any right of disposal by LICENSEE shall not prohibit LICENSOR from granting rights to others to use the property on Licensed Product during that disposal period.

10.5   <u>Exceptions to Right of Disposal</u>.   Notwithstanding the provisions of no. 10.4, LICENSEE shall have no right of disposal

(a)   if, as set forth in no. 10.4, all sums and statements due LICENSOR have not been paid or submitted; or

(b)   if termination was effected under the provisions of no. 6.3; or

(c)   if termination was effected due to the occurrence of the same default more than twice during the term, including during any renewal term; or

(d)   if termination was effected for:

(i)   sub-standard Licensed Product;

(ii)   material improper usage of the Property;

(iii)   failure to obtain prior LICENSOR approval; or

(iv)   failure to deliver Royalties or statements, or to permit an audit LICENSEE'S records, or to submit quality control samples.

10.6   <u>Delivery of Property</u>.   Upon termination of this Agreement without right of disposal as set forth in no. 10.5, finished products, all labels, signs, packages, wrappers, cartons, circulars advertisements and other items bearing or containing any reproduction or representation of any of the Property shall automatically and without cost to LICENSOR become the property of LICENSOR, and LICENSEE shall immediately deliver the same to LICENSOR'S place of business or any other location designated by LICENSOR.   The reasonable cost of such delivery shall be paid by the LICENSOR.

10.7   <u>Guaranteed Minimum Royalties</u>.   Upon termination or expiration of this Agreement, the total amount of outstanding Guaranteed Minimum Royalties due

through the full time period during which this occurs shall become immediately due and payable, less any Royalties or advances already paid.

## ASSIGNABILITY

11. This Agreement may be freely assigned by LICENSOR without LICENSEE'S consent or approval.  This Agreement, or any of the rights therein, may not be sold, transferred or assigned, in whole or in part by LICENSEE, except as provided for in no. 9.1 without the express written consent of LICENSOR.  If assigned, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

## NOTICES AND PAYMENTS

12.   All notices and other communications which either party hereto is required or may desire to give to the other, except for payments and statements which shall be sent to the party designated by LICENSOR, e.g., the Representative referred to in no. 5, shall be given by addressing the same to the other or to the Representative of LICENSOR at the address hereinafter set forth in this paragraph, or at such other address as my be designated in writing by any party in a notice to the other given in the manner prescribed in this paragraph,  All such notices shall be deemed given when sent so addressed by certified or registered mail, postage prepaid or by hand delivery, with proof of receipt, or by a reputable express delivery company which requires proof of receipt, such as but not limited to, Federal Express® or Airborne®.  The addresses to which the foregoing shall be given are the following:

If to LICENSOR:                                If to LICENSEE:

PEZ Candy, Inc.                               Playing Mantis, Inc.
35 Prindle Hill Road                          3618 Grape Road
Orange, CT  06477                             Mishawaka, IN  46545

Attention:  Scott McWhinnie                   Attention: Thomas Lowe

with a copy to:   Bradford Licensing Associates, 209 Cooper Avenue, Upper Montclair, NJ  07043.

## MISCELLANEOUS

13.1   Remedy For Breach.  LICENSEE acknowledges and agrees that a

breach of any of the covenants, agreements or undertakings hereunder will cause LICENSOR irreparable injury which cannot be readily remedied in damages or solely by termination of this Agreement and that LICENSOR, in addition to all other legal, and equitable remedies including costs and reasonable attorneys' fees, shall have the right of injunction for any breach of this Agreement by LICENSEE.

13.2    Relationship Between LICENSOR and LICENSEE.    Nothing herein shall create, be deemed to create or be construed as creating any partnership, employer-employee, joint venture, or agency relationship between the parties hereto or shall be deemed to render OWNER/LICENSOR liable for any of the debts or obligations of LICENSEE.  LICENSEE shall in no way be considered an agent or representative of OWNER/LICENSOR in any dealings which LICENSEE may have with any third party and neither of the parties hereto nor any of their employees or agents shall have the power or authority to bind or obligate the other party.

13.3    Survival of Provisions.  The expiration or termination of this Agreement shall not affect those provisions, and the rights and obligations therein, set forth in this Agreement which either:

(a)    by their terms state, or evidence the intent of the parties, that the provisions survive the expiration or termination of the Agreement, or

(b)  must survive to give effect to the provisions of this Agreement.

13.4    Entirety of Agreement; Amendment.  This Agreement constitutes and contains the entire agreement of the parties hereto relating to the subject matter hereof and no oral or written statements, representations, documents, promises or any other prior materials not embodied herein shall be of any force or effect.  This Agreement cannot be amended, altered or modified except by a written instrument executed by both parties hereto.  Once so executed, such amendments shall become an integral part of this Agreement, subject to all the terms and conditions herein and shall have full force and effect.

13.5  No Waiver.  The failure or delay of LICENSOR to exercise its rights under this Agreement or to complain of any act, omission or default on the part of LICENSEE, no matter how long the same may continue, or to insist upon a strict performance of any of the terms or provisions herein, shall not be deemed or construed to be a waiver of any subsequent breach or default of the terms of provisions of this Agreement.

13.6  Invalidity.  If this Agreement is subject to the approval of any government or government agency or similar entity, and such approval is not obtained, or is obtained but later revoked, it is understood and agreed to by the parties that this

Agreement is immediately rendered null and void and terminated, with neither party liable for any resultant damages, costs or expenses of the other. But for the foregoing, if any term, covenant, condition or provision of this Agreement or the application thereof to any person or circumstance, shall to any extent by held to be invalid, illegal or unenforceable, shall not be affected thereby, and each term, covenant, condition or provision of this Agreement shall be valid and shall be enforced to the fullest extent provided by the law.

13.7    Construction.    This Agreement shall be governed by and construed in accordance with the laws and the law of conflict of laws of the State of New York of the United States of America and the Courts of the State of the New York shall have sole and exclusive jurisdiction over all disputes arising out of this Agreement or any amendment thereof.

13.8    Headings.    The headings as to contents of particular provisions herein are inserted only for convenience and are in no way to be construed as part of this Agreement or as a modification of the scope of any terms or provisions of the Agreement.

14.    Performance Guarantee.    Licensee hereby unconditionally guarantees full and prompt performance of all terms, conditions and provisions of this Agreement.

IN WITNESS WHEREOF,  the parties hereto have executed this Agreement as of the day and year first set forth hereinabove.


(LICENSOR)

PEZ Candy, Inc.


By: _____          Date: _____
    Name:    Scott McWhinnie
    Title:    President

(LICENSEE)


By: _____          Date: _____
    Name:
    Title:

## **Schedule A**

## **Property**

PEZ® Candy
PEZ® Candy Dispensers
Non-Licensed Dispensers

## Schedule B

## Licensed Products

Building Blocks

## Schedule C

## Territory

United States including its
territories and possessions,
Canada