2.  <u>MMLLC Owns No Right of Publicity With Respect to Marilyn Monroe.</u>

Marilyn Monroe died a New York domicile.[7] The laws of the State of New York are clear; the right of publicity is limited to 'any living person.' New York Civil Law §§ 50, 51. In construing the statute's plain language, the courts concluded that the right of publicity "does not survive death." *Frosch, supra; Pirone v. MacMillan*, 894 F.2d 597, 585 (S.D.N.Y. 1990). "[W]hen the plain language of the statute is clear, courts need look no farther [sic] than those words interpreting the statute." *Cler v. Ill. Educ. Ass'n*, 423 F.3d 726, 730 (7th Cir. 2005). At death, Marilyn Monroe lost her right of publicity by *operation of law*. It was therefore, legally impossible for Ms. Monroe to devise to Lee Strasberg, through her Last Will and Testament, ownership of an extinguished right of publicity. Furthermore, the only right created in Indiana, the right to sue, was not devised by Marilyn Monroe as it was impossible for her to devise a right that did not yet exist.[8]

MMLLC owns no legally protected interest and should be barred from bringing the instant claim for violation of right of publicity based upon any law, including Indiana statutory law.

a.  <u>Marilyn Monroe's Last Will and Testament was Probated in New York Under New York Law</u>

MMLLC wrongly alleges ownership of Marilyn Monroe's extinguished right of publicity in its claims brought under Indiana law.[9] In *Factors, Etc., Inc. v. Pro Arts, Inc., infra*, the

---

[7] See arguments contained in Section B, below, and cases and statutes cited therein.
[8] When Marilyn Monroe died in 1962, Indiana's ROP Statute had not yet been enacted. Indiana's ROP Statute was enacted in 1994.
[9] IC 32-36-1-16 (5): The rights recognized under this chapter are property rights, freely transferable and descendible, in whole or in part, by… [t]estamentary document.; IC 32-36-1-17 (a)(2) The written consent required by Section 8 of this chapter and the rights and remedies set forth in the chapter may be exercised and enforced by a person to whom the recognized rights of personality have been transferred under section 16 of this chapter.

Second Circuit addressed the identical issue presented in the case-at-bar. The *Factors* court, considering claims based upon the famous entertainer, Elvis Presley's right of publicity concluded that while Conflict of Law principles governed procedural questions, property law necessarily applied to issues of property ownership.

> "[E]ven if a New York court would apply New York law in considering some elements of Factors' claim, such as the occurrence of an infringement, we feel certain that Tennessee law would be referred to in deciding whether Boxcar had a right of publicity in Presley's name and likeness, after his death, that was capable of being contracted for by Factors."

*Factors, Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278, 281 (2d Cir.1981). *See also Acme Circus Operating Co. v. Kuperstock*, 711 F.2d 1538, 1541 (11th Cir. 1983)(where the court held that the domicile determined whether the alleged property right existed at all).[10] The *Factors* court deferred to the Sixth Circuit's previous determination that Presley's right of publicity extinguished at death and thus precluded Presley's successor in interest from bringing suit as it did not rightfully own what was, by operation of law, non-existent. *Factors, supra.*, 652 F.2d at 281. *See also Groucho Marx Productions v. Day & Night Co.*, 689 F.2d 317, 319 (2d Cir.1982) ("[A] New York Court, considering a right of publicity case, would apply its property choice-of-law rules to select the state whose law determines whether a plaintiff has a protectable right of publicity."

A State's sovereignty determines *personal and property rights* within her territory. *Riley v. New York Trust Co.*, 315 U.S. 343, 349 (1942) (emphasis added). "A state is interested primarily... in the administration of the property of its citizens, wherever located, and that of strangers within in boundaries. In a society where inheritance is an important social concept, the

---

[10] *See also Cf. Restatement (2d) of Conflicts of Laws* (1971) § 147, Comment (i), noting that tort conflicts rules apply to issues of conversion of property, but property conflict rules apply to whether plaintiff has title to property allegedly converted).

managing of decedents' property is a sovereign right that may not be readily frustrated." *Id.* at 355. But it is exactly MMLLC's intent to frustrate the property laws of the State of New York by eviscerating established statutory and case law, and the settled administration of the Estate of Marilyn Monroe in New York State

MMLLC claims a post-mortem right of publicity in Ms. Monroe by virtue of devise in her Last Will and Testament. (See Decl. Anna Strasberg at ¶¶ 6, 7 and 8) Indiana courts hold that the law of the state where the Will was drafted, signed, and subject to probate controls. *Maurice F. Jones Trust v. Barnett Banks Trust Co., N.A.*, 637 N.E.2d, 1301, 1304 (1994). It is irrefutable that Ms. Monroe's Will was drafted, signed, and probated in New York. (SOF ¶¶1 and 2). Further, effective law at the date of a testator's death determines devisees' rights. *In re White*, 174 B.K. 775, 778 (Bkcy S.D. Ill. 1994); *In Re Estate of David*, 762 P.2d 745, 746 (Colo.A;;. 1988). On August 5, 1962, Ms. Monroe's date of death, neither New York common law nor statute recognized a post-mortem right of publicity. *Frosch, supra.* Upon her death, New York law prohibited Plaintiffs from receiving such a right by operation of Ms. Monroe's Will as only property actually owned by a testator was devisable by will. *In re Gernon's Estate*, 35 Misc.2d 12, 226 N.Y.S.2d 940 (1962). (See also SOF ¶10).

Ms. Monroe's will did not convey property to which she was not entitled at death. Her Will reads:

> SIXTH, All the rest, residue and remainder of my estate, both real and personal, of whatsoever nature and wheresoever situate, of which I shall die seized or possessed any power of appointment by will at the time of my death, including any lapsed legacies, I give, devise and bequeath as follows:…

(Anna Strasberg Decl. ¶6, Exh. C). Ms. Monroe was not seized or possessed of, or entitled to property rights allegedly created by the Indiana right of publicity statute when she died. As

successors-in-interest to Ms. Monroe's estate, through a residuary clause, Plaintiffs received no such right. (SOF ¶10)

    b.  <u>Choice of Law Principles Do Not Mandate Adherence to Indiana Statutory Law</u>

The Supreme Court of the United States has recognized that a Section 1404(a) transfer does not trigger a change in the *applicable substantive law*. See *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964) ("A Change in venue under § 1404 (a) generally should be, with respect to state law, but a change in courtrooms.") (Emphasis provided). Accordingly, this Court, in its May 19, 2002 Memorandum Decision Regarding Choice of Law, concluded that Indiana's choice of law rules apply to the transferred action, but not necessarily the substantive law. (See this Court's Memorandum Decision Regarding Choice of Law, Craven Decl ¶3, Exhibit B).

As noted above, the substantive law of either New York or Indiana demand the same conclusion: Lee Strasberg received no right of publicity through Marilyn Monroe's Last Will and Testament. Consequently, as Lee Strasberg's successors-in-interest own no legally protected interest; MMLLC (and CMG) fail to state any claim for which relief may be granted.

    c.  <u>This Court Should Follow the Principles of Full Faith and Credit and Comity and Deny Plaintiffs' Claims Brought Under Indiana Law</u>

Full faith and credit shall be given in each state to the public acts, records, and judicial proceedings of every other state. U.S.C.A. Const. art. IV, § 1. In practical terms "[f]ull faith and credit is a national policy, not a state policy. Its purpose is not merely to demand respect from one state for another, but rather to give us the benefits of a unified nation by altering the status of otherwise 'independent, sovereign states...' *Thomas v. Washington Gas Light Co.* 448 U.S. 261, 272; 100 S.Ct. 2647, 2656 (U.S.,1980). Whereas "the full faith and credit command 'is exacting' with respect to [a] final judgment ... rendered by a court with adjudicatory authority over the

12

subject matter and persons governed by the judgment, it is less demanding with respect to choice of laws. We have held that the Full Faith and Credit Clause '*does not compel a state to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate.*'" *Franchise Tax Bd. of California v. Hyatt*, 538 U.S. 488, 495 (internal citations omitted) (emphasis added).[11] Under its sovereign powers, the State of New York determines *personal and property rights* within her territory.[12] New York statutory and common law explicitly deny a right of publicity to deceased persons.

    3.    <u>Based Upon Indiana Common Law, New York Statutory and Common Law, Constitutional Law, and Conflict of Law Principles this Court Should Deny Plaintiffs' Claims Brought Under The Indiana Right of Publicity Statutes</u>

The Indiana ROP Statute is not retroactive in effect. It is well established in the State of Indiana that "[a]bsent an express indication otherwise, we presume that the legislature intends statutes and amendments to apply prospectively." *Chesnut v. Roof*, 65 N.E.2d 7,9 (Ind.Ct.App. 1996). The United States Supreme Court has found that the retroactive application of statutes to be a violation of substantive due process rights of the Fifth Amendment. *Bowen v. Georgetown University Hospital*, 108 S.Ct. 1073, 485 U.S. 903 (1988); *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998); *Langraf v. USI Film Products*, 511 U.S. 24, 266 (1944). MMLLC cannot claim a violation pursuant to the Indiana ROP Statute as it was not expressly drafted to have retroactive effect, Marilyn Monroe was not alive in 1994 and MMLLC does not own a posthumous right of publicity in Marilyn Monroe.

---

[11] "In this regard, it is interesting to note that in dealing with full faith and credit to statutes the Supreme Court in recent years has accorded no weight to language which purported to give a particular statute extraterritorial effect." *Thomas v. Washington Gas Light Co.* 448 U.S. 261, 272, 100 S.Ct. 2647, 2656 (U.S., 1980).

[12] *Riley* at 349.

4.   Even if the Court Determines That Marilyn Monroe's Will Devised Her Right of Privacy/Publicity, MMLLC Failed to Show That it Owns This Right.

As set forth above, SFA and Bradford assert that Marilyn Monroe could not have devised any right of privacy/publicity as Marilyn Monroe's domiciliary state, New York, does not recognize such a right. (SOF ¶10) However, even if this court were to determine that such a right did exist, no proof has been provided to show that such right now belongs to MMLLC. MMLLC claims that Lee Strasberg received 75% of Marilyn Monroe's residuary Estate. (See Strasberg Decl. ¶6 Exh. C) Further, Anna Strasberg claims that she received 100% of Lee Strasberg's residuary estate via will. Finally, Anna Strasberg claims that both she and the Anna Freud Centre[13] transferred their rights in the Estate of Marilyn Monroe to Marilyn Monroe, LLC in 1981. (See Strasberg Decl. ¶¶ 7 and 8, Exhs. C and D). However, after careful reading of these transfers, it is obvious that the only transfer made was ownership interest in Marilyn Monroe, LLC. As such, MMLLC has not even properly alleged that it has any rights to what was owned by the Estate of Marilyn Monroe, let alone a right of publicity.

5   Even if the Court Finds MMLLC Owns a Right of Publicity Regarding Marilyn Monroe, SFA Has Not Violated the Indiana ROP Statute

Even assuming, *arguendo*, that MMLLC and CMG have standing to bring the instant claim against SFA, MMLLC has failed to satisfy its initial burden with respect to proving that SFA violated any section of the Indian ROP Statute. Subsection 8 of the Indiana ROP Statue prohibits a person from using any aspect of a person's right of publicity for 100 years without written permission. (Ind. Stat. 32-36-1-8). Additionally, Subsection 9, the long arm provision of the statute, states as follows:

---

[13] It must be noted that the will does not even name the Anna Freud Centre as a beneficiary.

A person who

(1) engages in conduct within Indiana that is prohibited under section 8 of this chapter;
(2) *creates or causes to be created* within Indiana goods, merchandise, or other materials prohibited under section 8 of this chapter;
(3) *transports or causes* to be transported into Indiana goods, merchandise, or other materials created or used in violation of section 8 of this chapter; or
(4) *knowingly causes advertising or promotional material* created or used in violation of section 8 of this chapter to be published, distributed, exhibited, or disseminated within Indiana;
Submits to the jurisdiction of Indiana courts. [Emphasis Added](Indian Stat. Section 32-36-1-9)

CMG and MMLLC's Second Amended Complaint against SFA merely generally claims that SFA (and Bradford) violated the Indiana ROP Statute without giving specific instances of violations.[14] In the instant motion, MMLLC, for the first time, gives any specific allegation of a violation of the Indiana ROP Statute. (See SOF ¶ 24). However, there are no grounds to grant summary judgment, as genuine issues of material fact exist.

Firstly, MMLLC has not proven that SFA (or Bradford) knowingly caused the allegedly infringing t-shirt to be sold in Indiana. Other than a declaration signed by an attorney who represents CMG, there is no proof that this t-shirt was actually purchased at a Target Store in Indiana. (See Counter Statement of Facts ("COF") at ¶1) More importantly, there is no proof alleged that SFA knowingly caused this shirt to be sold in Indiana. (COF ¶1). As this Court is aware, SFA has made it a business policy not to do business in Indiana.[15] (See COF ¶ 1 and SOF ¶15). SFA merely licenses to third parties the right to copy and reproduce images controlled by

---

[14] It was alleged that SFA's images were part of a film released by Valhalla Productions, LLC. and that items bearing Marilyn Monroe's likeness were created. Even if true, the film by definition cannot violate the Indiana ROP Statute as films are allowed. With respect to the other items bearing Marilyn Monroe's likeness, no evidence was set forth stating who created these items and if they were sold in Indiana.

[15] See Court's recitation of the facts set forth in its memorandum decision annexed to Craven Decl. ¶ 3 and Exh. B.

it pursuant to a settlement agreement. (SOF ¶24). SFA does not actually create or sell any merchandise bearing Sam Shaw's Marilyn Monroe photographs. (SOF ¶24) SFA does not warrant and represent that it owns or has a right to any right, title or interest in the name, likeness or image of Marilyn Monroe. (SOF ¶25). Additionally, SFA does not hold itself out to be the Estate of Marilyn Monroe/Marilyn Monroe, LLC or to be affiliated with same. (SOF ¶25)

As defendants only first alleged the aforementioned sale of a t-shirt in Indiana in the instant motion, and as effectively no discovery has been exchanged, SFA has had little opportunity to ascertain the validity of defendants' assertions. (COF ¶1 and SOF ¶22) SFA is aware that one of its licensees, Freeze, had an arrangement for selling t-shirts in Target Stores. (See Shaw Decl. ¶22) However, this agreement specifically mandated, in the strongest terms possible, that the licensee, and any of its business partners, refrain selling any product bearing Marilyn Monroe's image inside Indiana. (See Shaw Decl. at ¶22 and Reiter Decl. at ¶14) The contract with this licensee has a provision requiring said licensee to indemnify it in case any right of publicity infringement claim is brought against SFA. (See Shaw Decl. at ¶22 and Reiter Decl. at ¶14). It is clear, that if the instant claim is permitted to proceed in Court, SFA will need additional discovery to determine if the above licensee caused said t-shirt to be sold in Indiana and then permission to bring a third party indemnification claim against same. (COF ¶1).

Additionally, SFA's passive websites cannot be a basis for a violation pursuant to Indiana ROP Statute. These websites merely indicate to the world what photographic images belong to SFA and how to contact SFA in the event anyone is interested in the purchase of photos or licensing its images. (COF ¶¶16 and 18 and SOF¶16) These passive websites, which simply illustrate the images belonging to SFA, do not violate the Indiana ROP Statute. These sites would not even be sufficient to support the exercise of personal jurisdiction over non-resident

defendants. *Search Force, Inc. v. Dataforce Intern, Inc.*, 112 F.Supp.2d 771, 779 (S.D.Ind. 2000). As such, advertising on internet websites from outside a state cannot serve as a basis for liability under Indiana's ROP Statute.[16]

Moreover, Federal Copyright law pre-empts defendants' right of publicity claims. A person's right of publicity claim is preempted if based on commercial exploitation solely through copyrightable works. *Laws v. Sony Music Entertainment, Inc.* 448 F.3d 1134, 1141 (9th Cir. 2006). There is no exception to this preemption in the US Copyright Act for "commercial" or "advertising used of copyrightable subject matter. See 17 U.S.C. Section 301(a).

There is no evidence that SFA (or Bradford) made any uses of Marilyn Monroe beyond the photographic images themselves. As set forth above, SFA only licenses to others the right to reproduce their photographic images on various products, SFA does not claim ownership of any other right. (¶¶SOF 24 and 25) If SFA's licensees thereafter committed acts that violated any right of publicity MMLLC may own, MMLLC should instead commence action against that party. Practically no discovery herein has been completed.

6. **If MMLLC's Motion for Summary Judgment is Granted, Punitive Damages and Attorneys Fees Are Not Warranted.**

SFA has at all times acted in good faith, believing that no surviving right of publicity in Marilyn Monroe existed. (See Shaw Decl. ¶13) Neither Larry Shaw, Edith Marcus, Meta Stevens, SFA or Sam Shaw had never previously received a cease and desist letter from CMG, Marilyn Monroe, LLC or any other entity claiming to own this alleged right. (See Shaw Decl. ¶13) Further, Larry Shaw has been commercially marketing Sam Shaw's Marilyn Monroe images on behalf of Sam Shaw (and now SFA) since the 1980's. (SOF ¶17 and 18)

---

[16] A state is precluded from directly regulating interstate commerce. *Edgar v. MITE Corp.*, 457 U.S. 624, 640 (1982).

As Mark Roesler, the president of CMG, has had an open dialogue with some of the owners of SFA since 1999, it would have been relatively simple for Mr. Roesler to have contacted SFA to discuss his client's concerns. (See COF¶18 and Stevens at ¶3). CMG and MMLLC, rather than seek dialogue with SFA, and the other photographers family's who were sued in the Indiana Actions, sought to use their substantial financial advantage and strong arm these relatively financially strapped entities into a forced settlement. CMG and MMLLC have continued their acts of bad faith dealings throughout the pendency of this litigation. (See Shaw Decl. at ¶¶ 24 and 26). As such, if this Court finds on behalf of MMLLC, said defendant should not be rewarded with attorney's fees and punitive damages.

**B. Plaintiffs' Motion for Partial Summary Judgment, dismissing defendants MMLLC's and CMG's Count II Should be Granted as a Matter of Law**

    1.    <u>Plaintiffs' Claims for Alleged Violations of a Right of Publicity Regarding Marilyn Monroe are Barred by Collateral and Judicial Estoppels</u>

    a.)    <u>Plaintiffs are Collaterally Estopped from Claiming a Right of Publicity Exists after Marilyn Monroe's Death</u>

The estate of Marilyn Monroe has consistently maintained that Marilyn Monroe died a resident and domiciliary of New York, and therefore is subject to New York laws regarding whether a right of publicity exists after death. Defendants are therefore precluded from arguing otherwise, because "[u]nder the doctrine of Collateral Estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Dodd v. Hood River County*, 59 F.3d 852, 863 (9th Cir. 1995).

Under Indiana, New York and federal law, collateral estoppel applies where it is established that: (i) the issue necessarily decided at the previous proceeding is identical to the

18

one which is sought to be re-litigated; (ii) the first proceeding ended with a final judgment on the merits; and (iii) the party against whom collateral estoppel is asserted was a party or in privity with a party at the first proceeding. *Hydranautics v. Filmtec Corporation*, 204 F.3d 880, 886 (9th Cir. 2000). There can be no doubt that these three elements have been satisfied here. Under New York law and California law, collateral estoppel will be applied when it is shown that identical issues have already been litigated and decided in a prior proceeding where the parties had a full and fair opportunity to litigate. *DiLauria v. Town of Harrison*, 820 N.Y.S.2d 140, 141 (N.Y.A.D.2 Dept. 2006); *Alvarez v. May Dept. Sores Co.*, 49 Cal.Rptr.3d, 897 (2006). Since the actions that SFA claims now collaterally estopp MMLLC were decided in New York and California, it is respectfully submitted that New York law and California law apply respectively.

**i.) The Probate Court Orders**

It is indisputable that the Surrogates Court in New York relied upon the Estate's claim and representation that Ms. Monroe died a resident and domiciliary of New York. (SOF ¶¶ 1, 2, 3 and 4) The Notice of Probate filed in the State of New York, Surrogate Court by its proponent, Aaron Frosch, Marilyn Monroe's Trustee, and Executor of her will, identified Marilyn Monroe as being "late of the city of New York, County of New York and State of New York." (SOF ¶¶ 2 and 3). Mr. Frosch testified in a deposition for a separate matter that he had met Ms. Monroe about two years before she had retained him in 1961 in the execution of her will, and thereafter had continuous contact with Ms. Monroe about every two weeks during the period of his retention, which continued until the time of her death. (See SOF ¶3 and Marcus Decl. at ¶ 11, Exhibit K).

Mr. Frosch also filed a petition for Designation of Appraiser in the Surrogate Court in New York in which he stated "The decedent departed this life on the 5th day of August at Los

Angeles, California; that the said deceased was a resident of 444 E. 57th St, New York, NY."

(SOF¶¶2, 3 and 4 and Marcus Decl. at ¶8 and Exhibit G). The corresponding Report of Appraiser filed December 30, 1969 made the following finding:

> "First – I report that the decedent herein died a resident of the State of New York on the 5th day of August 1962, leaving a Last Will and Testament, a copy of which is hereunto annexed which was duly admitted to probate by this court on the ___ day of _____, 19___ and thereafter on the 30 day of October 1962, Letters Testamentary upon the estate of said decedent were duly issued by this court to Aaron Frosch."

(SOF ¶¶ 3 and 4, and Marcus Decl. at ¶ 6, Exh. F). Additionally, on the 29th of May, 1969 the Surrogate's Court for the county of New York verified the Order Filing Tax on the Estate of Marilyn Monroe, determining that the Estate was rightly admitted to probate in New York, and that New York had a rightful claim to estate taxes. (See SOF ¶¶ 3 and 4 and Marcus Decl. at ¶9, Exh. I).

The issue in the Surrogate Court proceedings was identical as in the instant proceeding as the issue of Ms. Monroe's domicile would determine the Estate's assets and obligations for taxes. The issue was necessarily decided because the amount of taxes to be paid, and the identification and value of the property owned was determined by the domicile of Marilyn Monroe at the time of her death. The will was probated in New York and New York State Taxes were paid to New York on entire value of Ms. Monroe's estate.[17]

---

[17] Any property held in California was put to probate in California for limited purpose, as is the procedure California takes for probating the property of non-resident decedents.