### ii.) The Board of Equalization Proceedings

In the Board of Equalization ("BOE") Proceeding on April 22, 1975,[18] which was an appeal by Estate of Marilyn Monroe on a taxation issue, the BOE found that "at the time of her death in 1962, Marilyn Monroe was a resident of the State of New York; her will was admitted to probate in New York on January 14, 1963," and that "Miss Monroe having been a New York resident at the time of her death, appellant [Estate of Marilyn Monroe] is not a resident of California" (SOF ¶5)

The BOA further elaborated that

"[F]or the purposes of sections 18001-18011, section 18003 states that 'an estate or trust is considered a resident of the state which taxes the income of the estate or trust irrespective of whether the income is derived from sources within that state.' As the regulations make clear this language means that an estate is a resident of California only if, this state taxes its income from sources both within and without the state… Since California taxes an estate's income from all sources only when the decedent was a resident of this state… only estates of resident decedents are residents of California for purposes of the tax credit provisions of sections 18001-18011. Consequently, Miss *Monroe having been a New York resident* at the time of her death, appellant [Estate of Marilyn Monroe] *is not a resident of California* and is not entitled to the tax credit authorized by section 18004." (Emphasis added.)(Emphasis added)

(SOF ¶5). Moreover, in this action, the Estate of Marilyn Monroe argued that the source of the income at issue **income was in Ms. Monroe's** "domiciliary state, New York."[Emphasis added]. (SOF ¶5).

Once again, the Estate of Marilyn Monroe used the fact that Ms. Monroe died a resident and domiciliary of New York as a shield from California Tax Liability, and to get the benefit of New York Statutory application.     The issue that defendants seeks to relitigate now is identical

---

[18] This office has attempted to obtain a complete copy of the BOE's underlying record in this matter. However, we have been informed by the BOE that all underlying documents to this matter were administratively destroyed in the 1980s and that no records of same exist. Said records were requested in SFA and Bradford's Consolidated First Demand For Production of Documents. (SOF ¶ 7).

to the one that has been decided in the matters described above; namely the State of Ms. Monroe's domicile and residence at the time of her death. The party against whom collateral estoppel is asserted, MMLLC was a party or was in privity with a party at the first Proceeding,.[19] as MMLLC is the successor in interest to the Estate of Marilyn Monroe, according to defendants (See Strasberg Decl. ¶¶6-8) Here, the domicile of Ms. Monroe and the resulting domicile of her estate were not inconsequential to the matter at hand; the Estate sought to use the New York domiciliary status of the Ms. Monroe and her estate to avoid the imposition of California tax. Though the Estate of Marilyn Monroe did have to pay some taxes on income it derived from California, the Estate of Marilyn Monroe was successful in establishing that Marilyn Monroe was a non-resident of California and thus avoided estate taxes on the corpus of the estate in California. No appeal was taken from the BOE decision and it is now final. MMLLC is bound by Mr. Frosch's statements and actions and the BOE's decision.

### iii. *Frosch Case*

In 1980 Aaron Frosch, serving as the Executor of the Estate of Marilyn Monroe, sought damages from the wrongful use of photographs of Marilyn Monroe for a commercial purpose in the Norman Mailer book "Marilyn." See *Frosch,* supra.[20] The First Department of the New York Appellate Court affirmed the lower court's grant of summary judgment, dismissing Frosch's complaint. *Frosch, at* 768. (SOF ¶10).

In *Frosch,* the Appellate Division First Department held that Ms. Monroe's right of privacy pursuant to New York Civil Rights Law Section §§ 50, 51 did not survive death. . *Id* at 768. The Court further held that where "[P]laintiff, however, claims that there is an additional

---

[19] *Cicatello v. Brewery Workers Pension Fund*, 434 F.Supp. 950, 956 (W.D.N.Y. 1977)(Privity exists between the trustee and the trust beneficiaries, and the state decision is binding on them by virtue of the doctrine of *res judicata).*

[20] It should be noted that some of Sam Shaw's photographs were used in this book.

property right, a right of publicity which survives the death of Miss Monroe and belongs to the estate. No such non-statutory right has yet been recognized by the New York State Courts...."[21]

The positions argued by Mr. Frosch were subsequently reaffirmed by *James v. Delilah Films,* 544 NYS 2d 447, 451 (1989), which stated that, regarding "plaintiffs who are successors in interest, they have no cause of action under Civil Rights §§ 50, 51 as the statutory rights created by said law do not survive death." *See also Pirone v. MacMillan,* 894 F.2d 597, 585 (S.D.N.Y. 1990) ("the right of privacy protection...is clearly limited to 'any living person.'" (Emphasis provided); *Stephano v. News Group Publications, Inc.* 64 N.Y.2d 174; 474 N.E.2d 580; 485 N.Y.S2d 220 (Ct. App. 1984) First, in the *Frosch* case, it was found that where Marilyn Monroe was domiciled at the time of her death was essential as to whether or not she had a right of publicity that survived her, and could sue for its violation. Here, once again, the Estate of Marilyn Monroe/MMLLC is trying to relitigate that issue.

In *Frosch,* the issue of Marilyn Monroe's domicile and residency, and its consequential result that no postmortem right of publicity exists, was already, and finally, adjudicated by the appellate court's affirmation of the lower court's motion for Summary Judgment dismissing Frosch's complaint.[22] Since, due to Marilyn Monroe's New York residence and domicile at the time of her death, no postmortem right of publicity ever existed, and could no more be transferred than one could transfer by will, real or personal property that one no longer owned at the time of one's death. Plaintiffs here are the alleged successors to the rights of the estate of Marilyn Monroe. Plaintiffs are in privity with the plaintiffs in the *Frosch* litigation, the then

---

[21] The Appellate Division, noting that other jurisdictions were at odds with New York's refusal to allow a transferable right of publicity, held, alliteratively, that 1st Amendment issues also precluded the Estate of Monroe from asserting any right of publicity. *Id* at 768; *Brinkley v. Casablancas,* 80 A.D.2d 428; 438 N.Y.S2d 1004 (1981).

[22] On appeal, the issue of survival of Ms. Monroe's right of privacy and the issue of a separate common law right of publicity was fully briefed by all sides and argued before the Court.

executor, trustee and administrator of the Estate of Marilyn Monroe, as plaintiffs are the current holder of the very same alleged rights.

      b)    <u>Plaintiffs are Judicially Estopped from Claiming Ms. Monroe was not a Domiciliary of New York at the Time of Her Death.</u>

"Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." *Hamilton v. State Farm Fire & Casualty Company,* 270 F.3d 778, 782 (2001). This doctrine prevents a party from playing "fast and loose" with the courts and taking inconsistent positions from prior cases. *GEICO Ins. Co. v. Rowell*, 705 N.E.2d 476, 481 (Ind.Ct.App. 1999). Judicial estoppel is not limited to barring inconsistent positions in the same action but also in separate actions. "The application of judicial estoppel is not limited to bar the assertion of inconsistent positions in the same litigation, but is also appropriate to bar litigants from making incompatible statements in two different cases." *Hamilton, supra* 270 F.3d at 782. The application of judicial estoppel was broadened and made explicit to apply "even if the previous tribunal did not rely upon the first position if the party is playing 'fast and loose' with the court. Moreover, "the doctrine of judicial estoppel is not confined to inconsistent positions taken in the same litigation." *Risotto v. Plumbers and Steamfitters Local* 343, 94 F.3d 597, 605 (9th Cir. 1996).

In places where "the place of the tort 'bears little connection' to this legal action," Indiana choice-of-law analysis utilizes principles of interests analysis. *Allen v. Great Am. Reserve Ins. Co.*, 766 N.E.2d 1157, 1162 (Ind. 2002); *Simon v. United States*, 805 N.E.2d 798, 805 (Ind. 2004). Indiana law should not control as SFA and MMLLC are not residents of

Indiana and the claimed infringements herein occurred outside of Indiana. Further, the actions of MMLLC and its predecessors occurred outside of Indiana.

The Supreme Court applies a three part test for judicial esstoppel: i) the later position must be inconsistent with the earlier position; ii) the prior court was persuaded by the earlier position, so that an inconsistent position would now create the "the perception that either the first or the second court was misled," and iii) the party will deprive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *New Hampshire v. Maine*, 532 U.S. 742 (2001). New York State applies a two pronged test: (i) an inconsistent position must have been taken in the prior proceeding and (ii) the prior inconsistent position was adopted by the court in some manner. *Bates v. Long Island R.R. Co., 997 R.R. Co.*, 997 F.2d 1028, 1038) (2nd Cir. 1993).

The facts in the instant action are similar to *In Re Slade's Estate*, 154 Misc. 275, 277-278; 276 N.Y.S. 956, 958-959 (court date). In *Slade*, the Court held that claims by an executor during a probate proceeding, and estate tax proceeding, about the decedent's domicile was binding upon the widow.

Finally, and perhaps most importantly, in *Anna Strasberg v. Odyssey Group, Inc.* 51 cal. App 4th 906, 59 Cal.Rptr. 2d 474 (Cal.App. 2 Dist.,1996). Ms. Strasberg, as alleged sole beneficiary to the personal effects of Marilyn Monroe, sued the Special Administrix for alleged conversion of personal property. In that action, Ms. Strasberg prevailed, relying upon the rulings of the New York probate proceedings to claim title to the property she was suing to recover, which were withheld from Strasberg by Ms. Monroe's former business manager.

In every case preceding this action, the Estate of Marilyn Monroe, the Executors, Administrators, and successors have all consistently and uniformly maintained that Marilyn

Monroe was a resident and domiciliary of the State of New York. The Plaintiffs must now be judicially estopped from disclaiming those admissions. Moreover, the Estate's statements and actions are imputed on MMLLC. MMLLC's statements are now wholly inconsistent with respect to these prior statements and actions. Plaintiffs relied upon these statements and actions, and the subsequent decisions. Accordingly MMLLC, as the alleged successors to the rights of the Estate of Marilyn Monroe, should be judicially estopped from "playing fast and loose" by taking any position contrary to the multiple previous admissions that Marilyn Monroe was a resident and domiciliary of New York at the time of her death, and as a New York resident, no right of publicity survived her death, and therefore could not be transferred to plaintiffs.

2.    Marilyn Monroe Was a Domiciliary of New York at the Time of Her Death and Under New York Law No Right of Publicity Survived her Death

Even if this Court determines that MMLLC and CMG are not equitably or judicially estopped from asserting Marilyn Monroe was a New York State domicile at the time of her death, it is evident, as a matter of law, that she was domiciled in New York

According to Publication 555 of the Internal Revenue Service, "You have only one domicile even if you have more than one home. Your domicile is a permanent legal home that you intend to use for an indefinite or unlimited period, and to which, when absent, you intend to return. The question of your domicile is mainly a matter of your intention as indicated by your actions." *Internal Revenue Service, Publication 555* (Rev. June 2002)[23] (See Marcus Decl. ¶17, Exhibit "R"). The Internal Revenue Service lists factors in determining domicile, such as: (i) where you pay state income taxes, (ii)where you vote, (iii) Location of property you own, (iv)

---

[23] See also *State ex rel. Flaugher v. Rogers*, 77 N.E.2d 594, 595 (Ind. 1948)("A person has but one domicile, and that continues until a domicile is created in another place").

your citizenship, (v) length of residence, and (vi) business and social ties to the community. (*Internal Revenue Service, Publication 555* (Rev. June 2002)).

Marilyn Monroe was an actress in a time when the movie studios that she worked for were primarily in California. In 1955, however, she undeniably moved to New York City and quickly established her domicile there. Marilyn Monroe reaffirmed her residence and domicile in New York at the time of her marriage to Joe DiMaggio and again through her marriage to playwright Arthur Miller. Seven years before her death, in an interview with Dave Garroway on the 12th of June 1955 in a Monitor Beacon Radio Recording that she intended to make New York her home, at the time, and through her retirement.[24]  (See SOF ¶9). In fact, in 1959, Ms. Monroe executed an affidavit and power of appointment confirming her New York domicile. (SOF In fact, in 1959, Ms. Monroe executed an affidavit and power of appointment confirming her New York domicile. (SOF ¶11)  Ms. Monroe, even after the dissolutions of her marriages, did not leave New York, but instead continued to reside at 444 E. 57th St, New York, NY. In the State of New York, once a person has established domicile, which Marilyn Monroe clearly did, "Your New York domicile does not change until you can demonstrate that you have abandoned your New York domicile and established a new permanent domicile outside New York State. A

---

[24] Transcription of Monitor Beacon Radio Recording
Dave Garroway & Marilyn Monroe
**June 12, 1955**

Rptr:  "I'm scared of you. I'm awfully scared of you. I'm not sure whether I should be frightened of you or not."

MM:  "No, Nobody is scared of me."

Rptr:  "Well, I don't know. I bet a lot of guys are scared of you though because you're such an institution now. You are, and you are kind of a national possession. Do you feel that you belong to the nation as a whole?"

MM:  "Ah, it quite seems I am. I live here."

Rptr:  "...I hear that you are moving to New York today...to live."

MM:  "Yes, this will be my home from now on. It is until I retire and when I retire I'm going to retire to Brooklyn."

change of domicile must be *clear and convincing.*" (See New York State Department of Tax and Finance Publication 80, see ¶ 18, Exh. R) Additionally, "if your domicile is New York State and you go to a foreign country because of a business assignment by your employer… your domicile does not change unless you show that you definitely do not intend to return to New York State." (See New York State Department of Tax and Finance Publication 80). To imagine that over 40 years after her death it is appropriate to try to overshadow Ms. Monroe's own spoken intent to remake New York her permanent home from 1955 through her retirement would do a great disservice to the legal community which relies on facts rather than speculation and hearsay.

Copies of other documents, such as receipts, letterhead and dog licenses list Marilyn Monroe's New York address are also provided. (SOF ¶11). However, it must be noted that Marilyn Monroe, LLC/The Estate of Marilyn Monroe has been selling these documents at auction since 1999. (SOF ¶8). As such, SFA and Bradford may be further prejudiced to discover additional proofs of domicile should additional documents be required by this Court.

While New York State Department of Tax and Finance were, in Publication 80, addressing the scenario where an employee leaves the country for a temporary assignment, a parallel can be drawn for an actress who temporarily moves for the purposes of shooting a film. Clearly, at no time did Marilyn Monroe's domicile change from New York to California, but was merely there for the purpose of finite movie shoots.

Additionally, as set forth above, Mr. Frosch, submitted Ms. Monroe's will to probate in Surrogates Court, New York County. Further, Mr. Frosch testified in his deposition in connection with the *Frosch* case that he first met Marilyn Monroe 2 years before her death and from that point on, had continuous contact with her consisting of contact ranging from between twice a week to once every two weeks until the time of her death. This continuous contact and

the fact that Marilyn Monroe had named Frosch both Executor and Trustee of her estate in her Last Will and Testament placed Mr. Frosch in a good position to know Marilyn Monroe's state of domicile and residence.

### 3. The Indiana ROP Statute Does Not Create a Right of Publicity With Respect to Marilyn Monroe.

The facts and cases pertaining to the construction and application of the Indiana ROP Statute are set forth in Section A. above. As such, they will not be repeated here but are incorporated by reference. As a matter of law, the Indiana ROP Statute did not create a right of publicity in Marilyn Monroe for the benefit of Lee Strasberg, the Estate of Marilyn Monroe or MMLLC.

### 4. Laches Apply Herein to Prevent CMG and MMLLC to Now Assert a Right of Publicity in Marilyn Monroe.

Laches is an equitable time limitation on a party's right to commence an action that is "derived from the maxim that those who sleep on their rights, lost them." *Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975, 997 (9th Cir, 2006). Although laches is not usually applicable when a party commences a claim during the statute of limitations period, if any part of the alleged wrongful conduct occurred outside of the statute of limitations period, courts presume that the plaintiff's claims are barred by laches. *See Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 836-37(9th Cir.2002). In Order to succeed using a laches defense, a defendant must prove both (1) an unreasonable delay by plaintiff in commencing suit and (2) prejudice to himself/herself. *Miller at 997.* When deciding if a plaintiff's delay was reasonable or unreasonable, courts consider: (1) the length of the delay, measured from the time the plaintiff knew or should have known about his potential cause of action, and (2) whether the plaintiff's

delay was reasonable, including whether the plaintiff has proffered a legitimate excuse for his delay. *See Jarrow Formulas,* 304 F.3d at 838 (9th Cir. 2002)..

In *Miller*, the Court first determined that the applicable statute of limitations for trademark violations was 4 years. Further, the Court found that the defendants had used the alleged tradename, Glenn Miller for decades and that the plaintiff had constructive notice of this use. *Miller* at 942  Constructive notice was found as plaintiff at extensive time, the incentive and the means to discover this use. *Id* at 838.   CMG and Marilyn Monroe LLC's statute of limitations in Indiana and in California is two years. Clearly, MMLLC's inordinate delay (11 years from the day the Indiana ROP Statute became effective) was unreasonably long. Further, MMLLC and CMG knew or should have known that Larry Shaw, as agent for Sam Shaw, had been licensing the Sam Shaw Marilyn Monroe photographic images since the 1980s. (See SOF ¶17).

Bradford and SFA will be irreparably prejudiced if MMLLC is permitted to maintain a right of publicity in Marilyn Monroe. In fact, in such an event, SFA would go out of business. (See SOF ¶18) Conversely, CMG and MMLLC has made millions of dollars over the past several years. As such, Laches should apply to prevent MMLLC from now asserting any claim to ownership of Marilyn Monroe's right of publicity.

## VI.
## CONCLUSION

Marilyn Monroe's right of publicity extinguished at her death. By operation of law, Plaintiffs, as successors-in-interest to Lee Strasberg never received, and consequently own no claim to the non-existent post-mortem right of publicity. Plaintiffs own no legally protected interest. MMLLC and CMG fail to meet the Constitutional threshold to assert standing and are barred from bringing the instant claim for violation of right of publicity based upon any law,

including Indiana statutory law. Accordingly, MMLLC's instant motion should be denied  SFA

and Bradford's cross-motion for Summary Judgment dismissing MMLLC's and CMG's Count II

should be granted .

Dated: New York, New York
      November 29, 2006

Respectfully submitted,

By: _____
David Marcus (DM-0960)
Marcus & Greben
1650 Broadway
Suite 707
New York, NY 10019
Tel:  646-536-7602
Fax:  212-765-2210

Attorneys      for      plaintiff/consolidated
defendant SFA, plaintiff Edith Marcus and
Meta Stevens and Consolidated Defendant
Bradford Licensing, Inc.