UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

SHAW FAMILY ARCHIVES, LTD., BRADFORD
LICENSING, INC., JAMES E. DOUGHERTY,
and VALHALLA PRODUCTIONS, LLC.

                                                                          05 CV 3939 (CM)

        Plaintiffs/Consolidated Deendants,

                                                                          **Honorable Colleen**
    -against-                                                               **McMahon**

CMG WORLDWIDE, INC.,
and MARILYN MONROE, LLC,,

        Defendants/Consolidated Plaintiffs
------------------------------------------------------------------x

**DECLARATION OF LARRY SHAW IN SUPPORT SFA AND BRADFORD'S
CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
MMLLC'S MOTION FOR SUMMARY JUDGMENT.**

Marcus & Greben
1650 Broadway
Suite 707
New York, NY 10019
Tel: 646-536-7602
Fax: 212-765-2210

Attorneys for Plaintiff/Consolidated Defendant SFA, Plaintiff Edith Marcus and Meta Stevens and Consolidated Defendant Bradford Licensing, Inc.

AFFIDAVIT OF LARRY SHAW

After having first been duly sworn, Larry Shaw states:

1. I am an adult over the age of eighteen (18), have personal knowledge of the matters stated herein, and am competent to attest to such matters.

2. I am currently the chief executive officer of Shaw Family Archives, Ltd. ("SFA"). I have held this position since the creation of SFA on June 19, 2002.

3. SFA is a Limited Liability Company formed under New York Law, with its primary place of business located in New York.

4. SFA was created as part of the settlement of a lawsuit (the "Lawsuit") between my father Sam Shaw and me, relating to the ownership of photographs taken by Sam and me (the "photographs"). A copy of the relevant portion of the stipulation transcript is annexed hereto as Exhibit "A." The settlement agreement was entered into by me and my sisters Meta Shaw Stevens and Edith Shaw Marcus, as executors of my father's estate. The lawsuit settlement created SFA; vested ownership of the photographs in SFA; and provided that I owned a fifty percent (50%) interest in SFA and both my sisters owned twenty-five percent (25%) interests respectively.

5. SFA has never advertised or solicited business in Indiana through visits, telephone calls, and written communications or otherwise.

6. SFA has no office, employees or agents located in the State of Indiana. There are no known records or incidents of any SFA employee ever being in Indiana on SFA-related business

7. SFA has never appeared in court in Indiana or invoked the protection or authority of Indiana's government for any purpose other than this action.

8. SFA has no government licenses in Indiana.

9. SFA has never entered into any contractual relationship with any resident or citizens of Indiana or any business entity with its primary place of business in Indiana. In fact, SFA has, since its creation, purposefully refused to conduct business in Indiana as part of its business strategy.

10. SFA maintains a passive worldwide web Internet site located at http:/www.spc-promotions.com ("the Internet site"). SFA has a second affiliated Internet site located at http://www.samshaw.com (the "Sam Shaw site"). SFA does not accept order or conduct business directly through either the Internet site or the Sam Shaw site. True and accurate paper reproductions of the Shaw Family Archives' Internet site and the Sam Shaw site are attached hereto as Exhibits "B" and "C" respectively.

11. Currently, the SFA contains and owns photographs of Marilyn Monroe taken by Sam and/or myself (the "Marilyn Monroe Limited Edition Collection" images). These photographs and the right to market same were transferred to the SFA as part of the settlement agreement between the parties to the Lawsuit between me and Sam Shaw's estate.

12. From 1987 to 1994 I acted as my father's, Sam Shaw's, agent for the purpose of obtaining gallery showings of his work and the marketing of his photographic images. The most successful images marketed for licensing were his Marilyn Monroe photographs. From 1987 to 1994, the year I was terminated as Sam Shaw's agent, Sam Shaw's Marilyn Monroe images generated approximately $400,000.00 in revenues.

13. I was advised by various attorneys during the 1980's that the Estate of

Marilyn Monroe did not control any right of publicity in Marilyn Monroe's name, likeness and image. Except as set forth below, most of the licensing deals I was involved with, using my father's Marilyn Monroe pictures, did not include the Estate of Marilyn Monroe, or the Roger Richman Agency, the Estate of Marilyn Monroe's licensing agent. In 1993, as agent for Sam Shaw, I retained the services of attorney Martin Bressler, Esq. to commence a copyright infringement claim against St. Martin's Press and Susan Bernard.[1] During the course of his representation of my father, Mr. Bressler completed an investigation regarding the issue of Marilyn Monroe's right of publicity. Mr. Bressler found that Marilyn had died a domicile of New York, and as New York law did not recognize a descendible right of publicity for its domiciliaries, the Estate of Marilyn Monroe could not claim ownership of a right of publicity. Mr. Bressler wrote a letter to me dated June 11, 1993 setting forth said legal opinion. A true and accurate copy of said letter is annexed hereto as Exhibit "D." Commencing in 1993, I sent this letter to dozens of licensing companies in response to their queries with respect to the right of publicity issue. I was advised that representatives of the Estate of Marilyn Monroe were upset about this letter but neither he, nor I, ever received a cease and desist letter.

    14. On or about 1990, I participated in one deal with the Roger Richman Agency for the use of a single Sam Shaw image on a Ralph Marlin tie. Generally, such deals would generate a 10% license fee for the photographer, in this instance, Sam Shaw was given a meager 1% licensee fee. By making this deal with the Roger Richman agency, neither I nor Sam Shaw acknowledged any right of publicity in Marilyn Monroe,

---

[1] This copyright infringement claim involved the infringement of numerous Sam Shaw Marilyn Monroe photographic images.

rather, I viewed this as a straight licensing arrangement set up by the Roger Richman agency. From that moment, as far as I recall, neither I, my father nor SFA did business directly with the Roger Richman Agency, the Estate of Marilyn Monroe or CMG.

15. On or about February 14, 2004 SFA entered into an Image Licensing Agreement with Schani Krug/Valhalla Productions ("Valhalla"), a New Hampshire film production company with its principle place of business in New Hampshire (the "Image Agreement"). A true and accurate copy of the Image Agreement is attached hereto as Exhibit "E." The Image Agreement was negotiated and entered into subject to SFA's policy of not conducting business in Indiana. It does not involve any action and/or business activity by SFA in Indiana.

16. The Image Agreement related to the use of SFA Marilyn Monroe Limited Edition Collection images in a film/video/DVD project pertaining to Marilyn Monroe's first husband, Jim Dougherty's, life story entitled 'Marilyn's Man" (the "Project"). Pursuant to the Image Agreement, Valhalla, and its marketing agent Bradford Licensing, were entitled to use SFA Images solely in the Project and in the marketing, media and merchandising of the Project, so long as much marketing media and merchandising were not done in Indiana.

17. Prior to the creation of SFA, Meta Shaw Stevens and Edith Shaw Marcus communicated with Mark Roseler, the president of CMG Worldwide, Inc. ("CMG"). CMG was reportedly interested in seeing and perhaps using images in Sam Shaw's collection of images. Additionally there was a meeting between Meta Shaw Stevens, Edith Shaw Marcus and Mr. Roesler in New York, New York in late 1999 or early 2000. These communications did not relate to the transactions at issue in this lawsuit. Further,

no contractual relationship developed from these communications. Finally, these communications were not conducted on behalf of SFA, which did not even exist as a legal entity at the time. In fact, at the time these conversations took place, the Lawsuit was ongoing between the different Shaw family members.

19. Meta Shaw Stevens had follow-up conversations with Mr. Roesler following the creation of SFA in 2002. These conversations did not lead to any business and/or contractual relationship between SFA and CMG, and none of these conversations related to the transactions at issue in this lawsuit.

20. SFA has made no efforts to serve, directly or indirectly, the Indiana market for its services. In fact, SFA has specifically structured its business activities to avoid the privilege of conducting business in Indiana.

21. SFA has never acted in a manner in which would have, or could have, resulted in confusion in the marketplace with itself and Marilyn Monroe, LLC.

22. I have read the instant Notice of Motion, Statement of Irrefutable Facts, Memorandum in Support and Supporting Declarations. My attorneys have advised me that the instant motion for Partial Summary Judgment is meritless and is based on alleged facts and circumstances which have not previously been disclosed. Moreover, Marilyn Monroe, LLC. assert misrepresentations in the Statement of Irrefutable Facts. To the contrary, neither SFA, any agent or representative of SFA ever directly advertised any services in the State of Indiana.. The aforementioned websites operated by SFA merely show samples of some of the images that are available for purchase or license. Upon information and belief, the Estate of Marilyn Monroe previously used the Roger Richman Agency as its licensing agent from the mid 1980's to approximately 1993. Thereafter,

The Estate of Marilyn Monroe retained CMG as its agent in approximately 1993.[2] The statement that CMG and Marilyn Monroe, LLC has worked together for decades licensing Marilyn Monroe is incorrect and was so asserted in order to make this court assume that movant and CMG have invested significant time and resources into merchandising Marilyn's image. Furthermore, SFA did not sell or cause to be sold the t-shirt claimed by movants to have been sold in a Target Store in Indiana. SFA does not sell any merchandise, does not directly license any image and does not conduct any business in Indiana. I am not in possession of any facts necessary to determine if or how said t-shirt was purchased and sold in Indiana. I have been advised by representatives from Bradford Licensing that Freeze, the licensee who produces and sells units of this particular T-shirt, specifically kept all such merchandise out of the State of Indiana. We are in the process of getting written confirmation that no such sales were made in Indiana. Moreover, SFA's agreement with the licensee contains an indemnification provision that would require this licensee to pay all reasonable attorneys fees and any damages that may result from a law suit.

23. Conversely, I believe that SFA's motion for summary judgment should be granted as it is clear that MMLLC does not own any right of publicity in Marilyn Monroe. I maintain, as I have always maintained, that this right terminated in 1962 when Marilyn Monroe died.

24. At all times herein, CMG and MMLLC has acted in bad faith. Although my sister, Meta Stevens, had been talking to Mr. Roesler since 1999, neither he, any representatives from his company CMG, or MMLLC, ever contacted SFA prior to the commencement of the complaint. Further, during the time we were supposed to conduct

---

[2] In 2001, the Estate of Marilyn Monroe transferred its assets to Marilyn Monroe, LLC.

settlement negotiations, CMG and MMLLC failed to act in a manner that would allow these negotiations. The only meeting that was scheduled was in California and SFA, a company that has not even turned a profit, could not afford to send any representatives to that meeting. Our frequent requests to discuss settlement in New York were not answered and our willingness to mediate was spurned.[3] Additionally, Mark Roesler contacted me several months ago and extended an olive branch to further settlement negotiations. He flew to New York and met the owners of SFA and we showed him the entire archive owned by SFA. He put me in contact with Kitty Monte Alto, Vice President and Director of International Operations of CMG Worldwide in order to arrange three exhibitions of "Marilyn and Friends" in Brazil and Argentina. Over the last few months, SFA has spent over $4,000.00 and many hours of time scanning images and promotional materials needed by Ms. Alto to secure Museum venues and sponsorship. However, in a cruel act of bad faith, Mr. Roesler recently informed Ms. Alto not to proceed with the Exhibitions. A copy of an email I received from Ms. Alto sent on November 23 is annexed hereto as Exhibit "F."

25. Since 1987, and continuing through the present day, we have spent tens of thousands, if not hundreds of thousand of dollars, marketing and advertising Sam Shaw's photographs of Marilyn Monroe. From 1994, to 2002, the amounts generated by these images fell due to the aforementioned lawsuit with my father. However, many of the deals put in place prior to 1994 continued and were renewed during that lawsuit. Further, as set forth above, the Estate of Marilyn Monroe/Marilyn Monroe, LLC. and their

---

[3] I have been informed by attorneys that the day after we agreed to CMG and MMLLC's terms to conduct mediation, we were served with the instant motion. Further, despite that fact, we attempted to schedule a settlement conference in New York. Although attorneys for MMLLC stated their willingness to conduct settlement negotiations with SFA and Bradford in New York, representatives of MMLLC have failed to return our attorney's phone calls.

representatives knew or should have known about these activities. SFA presently has numerous outstanding deals in place involving our Marilyn Monroe Images. In fact, the proceeds generated by SFA are almost exclusively based on our Marilyn Monroe deals. If MMLLC is now retroactively granted a right of publicity in Marilyn Monroe, SFA will be financially ruined.

26. As MMLLC and CMG have acted in bad faith, including commencing the instant action without ever having first contacting us, and without ever previously having acting to enforce MMLLC's alleged right of publicity ownership interests, no punitive damages or attorneys fees should be awarded to MMLLC.

27. I understand that this Court used a letter from me to CMZ Handbags and Jewelry, dated September 22, 2003, as evidence that I was trying to keep companies from doing business in Indiana. A copy of said letter is annexed hereto as Exhibit "G."[4] This is not true. According to the letter, I merely advised CMZ that it was our opinion that MMLLC did not own any right of publicity in Marilyn Monroe. I even instructed CMZ to contact its lawyers to verify this fact. A copy of my letter to CMZ dated October 6, 2003 is annexed hereto as Exhibit H. CMG and MMLLC was free to do the same, but did not. Further, the agreement with CMZ itself specifically states that SFA only licensed a photographic image, it did not purport to grant any license to any trademark and in the name Marilyn Monroe. See a true and accurate copy of said agreement with CMZ annexed hereto as Exhibit "I."

---

[4] Further, this Court should be aware that I originally became aware that CMZ was marketing product using Sam Shaw's Marilyn Monroe photographic images without our permission. I contacted CMZ in order to advise them that I was aware of their actions and sought to formalize an agreement to retroactively grant permission to use SFA's image and to be paid.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on the 28th day of November, 2006, at Piermont, New York.

_____
LARRY SHAW