# Exhibit 3

COPY

1  WILLIAM E. WEGNER, SBN 101486
   Email:  wwegner@gibsondunn.com
2  AMNON Z. SIEGEL, SBN 234981
   Email:  asiegel@gibsondunn.com
3  GIBSON, DUNN & CRUTCHER LLP
   333 South Grand Avenue
4  Los Angeles, California 90071-3197
   Telephone: (213) 229-7000
5  Facsimile: (213) 229-7520

6  Attorneys for Plaintiffs,
   MARILYN MONROE LLC and
7  ANNA STRASBERG

8  PETER T. HAVEN, SBN 175048
   Email: p.haven@mpglaw.com
9  MUSICK, PEELER & GARRETT LLP
   One Wilshire Boulevard
10 Los Angeles, CA 90017-3321
   Telephone:  (213) 629-7765
11 Facsimile:  (213) 624-1376

12 JONATHAN G. POLAK (admitted *pro hac vice*)
   Email: jpolak@sommerbarnard.com
13 SOMMER BARNARD PC
   One Indiana Square, Suite 3500
14 211 N. Pennsylvania
   Indianapolis, IN 46204
15 (317) 713-3500 Phone
   (317) 713-3699 Fax

16
17 Attorneys for Plaintiff, CMG WORLDWIDE, INC.

FILED
CLERK, U.S. DISTRICT COURT

DEC 18 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                      DEPUTY

18          UNITED STATES DISTRICT COURT
19          CENTRAL DISTRICT OF CALIFORNIA
            WESTERN DIVISION

| | |
|---|---|
| 20  CMG WORLDWIDE, INC., an Indiana Corporation, and MARILYN MONROE LLC, a Delaware Limited Liability Company, | CASE NO. **CV-05-02200-MMM (Ex)** |
| 21 | |
| 22 | **PLAINTIFFS MARILYN MONROE, LLC'S AND CMG WORLDWIDE, INC.'S SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| 23              Plaintiffs, | |
| 24        v. | |
| 25  TOM KELLEY STUDIOS, INC., a California Corporation, | |
| 26              Defendant. | |
| 27 | [Supplemental Declarations of Anna Strasberg and Amnon Z. Siegel, Declaration of Daniel Siegel, and accompanying exhibits filed concurrently herewith] |
| 28 | |
| | Honorable Margaret M. Morrow |

1   CMG WORLDWIDE, INC., an Indiana
    Corporation, and MARILYN MONROE,
2   LLC, a Delaware Limited Liability
    Company,

3
                 Plaintiffs,
4
            v.
5
6   THE MILTON H. GREENE
    ARCHIVES, INC.,

7                Defendant.

8   THE MILTON H. GREENE
    ARCHIVES, INC.,

9                Plaintiff,

10          v.

11  CMG WORLDWIDE, INC., an Indiana
    Corporation, and MARILYN MONROE,
12  LLC, a Delaware Limited Liability
    Company, ANNA STRASBERG, an
13  individual,

14               Defendants.

15  TOM KELLEY STUDIOS, INC., a
    California Corporation,
16
                 Plaintiff,
17
            v.
18
19  CMG WORLDWIDE, INC., an Indiana
    Corporation, and MARILYN MONROE,
    LLC, a Delaware Limited Liability
20  Company, ANNA STRASBERG, an
    individual,
21               Defendants.

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

# TABLE OF CONTENTS

Page

I.      INTRODUCTION.................................................................................................. 1

II.     MARILYN MONROE'S WILL PASSED HER RIGHT OF PUBLICITY
        TO THE RESIDUARY BENEFICIARIES. ........................................................ 3

        A.      The authorities in the Tentative Order do not show how a New
                York or California court would treat property acquired by a testator
                after death.......................................................................................... 3

        B.      Testamentary intent and avoidance of intestacy are paramount
                principles of probate law. ................................................................... 9

        C.      A residuary clause is effective to devise property acquired after
                death and distributed prior to the close of probate................................ 12

III.    CALIFORNIA'S POSTHUMOUS RIGHT OF PUBLICITY STATUTE
        SHOULD BE READ TO ALLOW PERSONS WHO DIED PRIOR TO
        1985 TO DEVISE THEIR RIGHTS. ................................................................... 16

IV.     CONCLUSION .................................................................................................... 20

# TABLE OF AUTHORITIES

Page(s)

## Cases

Acme Circus Operating, Inc. v. Kuperstock,
711 F.2d 1538 (11th Cir. 1983).......................................................................... 15

Comedy III Productions v. Gary Saderup, Inc.,
25 Cal.4th 387 (Cal. 2001).................................................................................. 15

Conlee v. Conlee,
269 N.W. 259 (Iowa 1936).................................................................................. 4, 5

Estate of Hermon,
39 Cal. App.4th 1525 (1995)............................................................................... 9

Estate of Karkeet,
56 Cal. 2d 277 (1961).......................................................................................... 10

Estate of Wilson,
184 Cal. 63 (1920).............................................................................................. 9

Groucho Marx Prods., Inc. v. Day and Night Co., 689 F.2d 317 (2d Cir.
1982).................................................................................................................... 15

Gugliemi v. Spelling-Goldberg Prods.,
25 Cal.3d 860 (1979).......................................................................................... 15

Hirsch v. Bucki,
148 N.Y.S. 214 (1914) ........................................................................................ 9

In re Albert,
445 N.Y.S. 2d. 359 (Sup. Ct. 1981) ................................................................... 6, 8

In re Brunet,
34 Cal.2d 105 (1949)........................................................................................... 6, 8

In re Buzza's Estate,
194 Cal. App. 2d 598 (1961)............................................................................... 4

In re Estate of Blake,
157 Cal. 448 (1910)............................................................................................. 10

In re Estate of Braman,
258 A.2d 492 (Pa. 1969) ..................................................................................... 7, 8

In re Estate of Goyette,
123 Cal. App.4th 67 (2004).................................................................................. 10

In re Estate of Jones,
38 N.Y.2d 189 (1975).......................................................................................... 10

In re Estate of Kosek,
31 N.Y.2d 475 (1973).......................................................................................... 10

In re Estate of O'Brien,
627 N.Y.S.2d 544 (Sur. Ct. 1995)....................................................................... 10

In re Hite,
700 S.W.2d 712 (Tex. App. Corpus Christi 1985), writ refused n.r.e) ............. 7, 13

In re Klewer's Estate,
124 Cal. App. 2d 219 (1954)............................................................................... 10, 11

*In re Penrose's Estate,*
  299 N.Y.S. 844 (Sur. Ct. 1937) ........................................................ 4, 5, 6

*In re Schunk,*
  No. 321397, 2005 N.Y. Misc. LEXIS 1312 (Sur. Ct. June 29, 2005) .............. 12, 13

*In re Van Winkle's Will,*
  86 N.Y.S.2d 597 (Sur. Ct. 1949) ....................................................... 3, 4

*In re Williams' Will,*
  221 N.Y.S.2d 799 (Sur. Ct. 1961) .................................................. 10, 11

*Lugosi v. Universal Pictures,*
  25 Cal. 3d 813 (1979) ...................................................................... 15

*Matter of Wells,*
  113 N.Y. 396 (1889) .......................................................................... 5

*McKay v. Lauriston,*
  204 Cal. 557 (1928) ....................................................................... 4, 5

*Miller v. Glenn Miller Prods., Inc.,* 318 F. Supp. 2d 923 (C.D. Cal. 2004)
  (Matz, J.), *aff'd, Miller v. Glenn Miller Prods., Inc.,* 454 F.3d 975 (9th
  Cir. 2006) ............................................................................... passim

*Newman v. Wells Fargo Bank,*
  14 Cal. 4th 126 (1996) ...................................................................... 9

*Stewart v. Todd,*
  173 N.W. 619 (Iowa 1919) ............................................................... 4, 5

*Trustees of Calvary Presbyterian Church of Buffalo v. Putnam,*
  221 N.Y.S. 692 (1927) ....................................................................... 6

*Ware v. Beach,*
  322 P.2d 635 (Okla. 1958) .................................................................. 4

**Statutes**

Cal. Civ. Code § 3344.1 ............................................................... passim

Cal. Civ. Code § 3344.1(b) ........................................................... 2, 16

Cal. Civ. Code § 3344.1(c) ............................................................... 16

Cal. Civ. Code § 3344.1(d) ........................................................ 16, 17

Cal. Civ. Code § 3344.1(h) ................................................................. 2

Cal. Prob. Code § 11642 ............................................................ 12, 13

Cal. Prob. Code § 21102(a) ................................................................ 9

Cal. Prob. Code § 21109 .................................................................... 6

Cal. Prob. Code § 21110 ................................................................. 6, 8

Cal. Prob. Code § 21120 ................................................................... 10

EPTL § 11-1.1(b)(1) ................................................................... 12, 13

EPTL § 3-3.1 .............................................................................. 8, 9

EPTL § 3-3.4 ................................................................................. 8

EPTL § 6-5.1 ................................................................................. 6

Ind. Code § 32-36-1-16 ................................................................... 16

Gibson, Dunn &
Crutcher LLP

Ind. Code § 32-36-1-17 ................................................................ 16

Ind. Code § 32-36-1-18 ................................................................ 16

N.Y. Decedent Estate Law §14 .................................................... 8, 9

Restatement (Third) of Property, Wills and Other Donative Transfers
  § 10.1 (1999) ........................................................................ 10, 12

Uniform Probate Code § 2-602 .................................................... 12

### Other Authorities

J. Thomas McCarthy, The Rights of Publicity and Privacy § 6:39, at 871
  (2d ed. 2006)........................................................................... 15

Schuler on Wills, § 27 at 34 (6th Ed.)........................................... 5

Wade R. Habeeb, *Effect of Residuary Clause to Pass Property Acquired by
  Testator's Estate After His Death*, 39 A.L.R.3d 1390 ................... 7

Gibson, Dunn &
Crutcher LLP

Plaintiffs submit this supplemental briefing to address highly significant issues of inheritance law as applied to deceased celebrities presented by the unprecedented restriction on the inheritability of rights of publicity created in the Court's tentative ruling.

## I.    INTRODUCTION

The tentative ruling is based on the Court's interpretation of a "general principle" of probate law" that testators may not devise by will property not owned at the time of their death.  Relying on this asserted principle, the Court has tentatively concluded that as a matter of law Marilyn Monroe could not have devised through her will any rights under the California and Indiana posthumous right of publicity statutes because those statutes were not passed until after her death (1984 and 1994, respectively), and thus Plaintiffs do not own Marilyn Monroe's right of publicity.  Tentative Order Granting Defendants' Motion for Summary Judgment ("Tentative Order") at 12-18.

The authorities cited in the Tentative Order, however, do not support such a "general principle," i.e., that no after-acquired property can be added to an estate and pass through the will.  Rather, the cases and other authorities cited in the Tentative Order address different issues:  whether devises of property rights (1) actually owned by another (such as the testator's relation) or (2) extinguished at the testator's death can pass through a will.  The authorities cited do not concern the disposition of property rights lawfully acquired by an estate after a testator's death.

By contrast, there are other, well-settled rules of probate concerning the construction of wills that are directly applicable here, but not employed in the Tentative Order.  The paramount rules of will construction in both California and New York are that a will be construed to give effect to the intent of the testator and that intestacy be avoided whenever possible in favor of a residuary disposition.  Here, the Court should apply these cardinal rules to avoid intestacy and carry out Marilyn Monroe's intent to leave her intellectual property rights to the residuary beneficiaries of her will.

Any argument that Marilyn Monroe was not entitled to dispose of her rights of

1  publicity at the time of her death, because such rights were not recognized as devisable

2  until 1985, fails. California Civil Code Section 3344.1, expressly reaches back in time

3  to codify rights in celebrities who died within 70 years of January 1, 1985. Cal. Civ.

4  Code § 3344.1(h). It also unambiguously recognizes that such rights are transferable by

5  testamentary documents – and no distinction is made as to those celebrities deceased

6  before the statute's passage. Cal. Civ. Code § 3344.1(b). Ms. Monroe's will *at the time*

7  *of her death* included a broad residuary clause which, among other property, bequeathed

8  all property "to which [she] shall be in any way entitled...." Thus, as discussed below,

9  when the California legislature clearly articulated that property right in 1985 in favor of

10  a group of deceased celebrities (which included Ms. Monroe), the statute expressly

11  permitted this entitlement to pass through the residuary clause of her will.

12  The probate of Marilyn Monroe's will reinforces this conclusion. On June 19,

13  2001, while Marilyn Monroe's estate remained open and after both the California and

14  Indiana posthumous rights of publicity were passed, the Surrogate's Court of New

15  York, where Marilyn Monroe's will was probated, specifically ordered the distribution

16  of Marilyn Monroe's intellectual property rights to the residuary beneficiaries. These

17  rights were defined in the petition as the "decedent's participation rights in motion

18  pictures and royalties from the licensing of the Decedent's name, likeness and

19  signature," i.e., included her publicity rights. This distribution by the Surrogate's Court

20  is in accordance with authority under New York or California law that allows property

21  acquired by an estate after death to pass through the residuary clause of a will.

22  Ownership of the right of publicity by the residuary beneficiaries also is

23  consistent with the intent of the legislatures in California and Indiana in enacting the

24  right of publicity statutes at issue and applying them in a uniform manner to both living

25  and deceased celebrities. In line with the fundamental rules of will construction that

26  make the intent of a testator paramount and that strongly disfavor intestacy, both of

27  these statutes provide that the publicity rights pass via intestacy to designated heirs *only*

28  if the deceased personality did not otherwise provide for their transfer by contract, trust

Gibson, Dunn &
Crutcher LLP

2

1  or testamentary documents before death.

2      Indeed, both this Court and the devisees of deceased personalities who died

3  before January 1, 1985 have applied the California statute this way in practice . In

4  *Miller v. Glenn Miller Productions, Inc.*, 318 F. Supp. 2d 923 (C.D. Cal. 2004) (Matz,

5  J.), *aff'd, Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975 (9th Cir. 2006), the

6  court found, without discussion, that the publicity rights of Glenn Miller (who died

7  testate in 1944) under Section 3344.1 were passed by his residuary clause in 1944,

8  licensed by the residual beneficiary in 1956, and again conveyed through a residuary

9  clause in 1966.  Moreover, a number of devisees under wills of deceased personalities

10  who died prior to 1985 have exercised the publicity rights of those deceased

11  personalities under Section 3344.1, as shown by registrations with the California

12  Secretary of State's Office.  Any of these devisees that do not fit within the narrow

13  familial categories of the intestacy section of the statute – including siblings, friends,

14  universities, charities and institutions – would lose their rights under the interpretation

15  of the statute used in the Tentative Order.

16      As set forth in detail below, the Court should apply well-settled principles of

17  probate law and sound constructions of the California and Indiana right of publicity

18  statutes and find that Plaintiffs are the rightful owners of Marilyn Monroe's publicity

19  rights.  Accordingly, Plaintiffs respectfully request that the Court reconsider the

20  Tentative Order and deny Defendants' motion for summary judgment on standing.

21  **II.    MARILYN MONROE'S WILL PASSED HER RIGHT OF**
22  **PUBLICITY TO THE RESIDUARY BENEFICIARIES.**

23  **A.    The authorities in the Tentative Order do not show how a New York or**
24  **California court would treat property acquired by a testator after death.**

25      The Tentative Order relies on what it describes as a "general principle of probate

26  law" that a testamentary devise cannot bequeath property the testator does not own at

27  death.  Tentative Order at 14.  However, the case law supporting this proposition,

28  including the many cases cited in the Order, clarifies that this principle is applicable

Gibson, Dunn &
Crutcher LLP

1  where a testator is attempting to dispose of property owned by another person, or to

2  pass property interests of the testator that terminated by operation of law at or prior to

3  the testator's death. *In re Buzza's Estate*, 194 Cal. App. 2d 598 (1961); *In re Van*

4  *Winkle's Will*, 86 N.Y.S.2d 597 (Sur. Ct. 1949); *In re Penrose's Estate*, 299 N.Y.S. 844

5  (Sur. Ct. 1937); *Conlee v. Conlee*, 269 N.W. 259 (Iowa 1936); *McKay v. Lauriston*, 204

6  Cal. 557 (1928); *Stewart v. Todd*, 173 N.W. 619 (Iowa 1919). None of the cases cited

7  in the Tentative Order discuss whether an intended beneficiary of a residual clause

8  should be denied a property interest lawfully acquired by the decedent's estate on behalf

9  of that person, based on the efforts of that person in life.[1]

10        *Van Winkle*, for example, holds that a testator cannot devise property that is

11  legally owned by another at the time of the testator's death. In that case, Harry Van

12  Winkle, the testator, devised to his children a plot of land that was half-owned by his

13  brother. 86 N.Y.S.2d at 599. The court's holding that a testator cannot "subject[]

14  property not owned by a testator at the date of his death to any disposition whatever,"

15  refers to Harry's inability to devise the one-half interest in the land owned by his

16  brother. *Id.* at 600. The case does not discuss whether a residuary clause, intending to

17  dispose of all property to which the decedent is ever entitled, would effectively pass

18  property acquired after death through the probate estate.

19        *Buzza, McKay, Conlee* and *Stewart* all involved property interests that

20  terminated by operation of law at or before the testator's death. In *Buzza*, a California

21  Court of Appeal found that a testator/wife could not devise an inter vivos trust that

22  terminated by operation of law when her husband predeceased her. *Buzza*, 194 Cal.

23  App. 2d at 602. The "nonexistent" property to which the court refers is the trust, which

24  had already terminated by its own terms prior to the wife's death. *Id.* at 601. Similarly,

25

26  [1] The Tentative Order also cites *Ware v. Beach*, 322 P.2d 635 (Okla. 1958), to show
    that a prohibition on the postmortem devise of property is a "general principle."

27  The *Ware* case did not concern posthumous additions to an estate at all, but rather
    whether a particular 1950 congressional statute pertaining to statutory election

28  rights of American Indians should be applied retroactively. *Id.* at 639.

1  in *McKay*, a wife attempted to devise an interest in community property that terminated
2  and became her husband's upon death under applicable community property laws. 204
3  Cal. at 566. In *Conlee*, the Supreme Court of Iowa held that an interest in joint tenancy
4  could not be devised because under the right of survivorship the property passed to the
5  joint tenant by operation of law at the testator's death. 269 N.W. at 264. The same
6  court held in *Stewart* that a wife could not devise property by will, where she had
7  already agreed in an enforceable partnership agreement to leave such property to her
8  husband upon death. 173 N.W. at 624. Thus, none of these cases involved the actual
9  lawful acquisition of property interests by the testator after death.

10  *Penrose* also did not involve property that came into being after the testator's
11  death, but rather a bequest to a decedent that failed under the common law rule of lapse,
12  which is not applicable here for the reasons explained below. In *Penrose*, William
13  Penrose predeceased his sister, Catherine Brady, whose will devised to William a one-
14  sixth interest in the residuary of her estate. 299 N.Y.S. at 844-45. The Surrogate's
15  Court of Erie County ultimately held that William's one-sixth interest in his sister's
16  residuary estate could not pass through the will, but must be distributed according to
17  intestacy laws. *Id.* at 848. According to the Court, "[t]he rule governing this question is
18  that a legatee who died before the testator could not bequeath what he would have
19  received under the testator's will if he had survived him." *Id.* at 846 (citing Schuler on
20  Wills, § 27 at 34 (6th Ed.)). This is a variation of the common law rule of lapse, under
21  which a bequest to a beneficiary predeceasing the testator was invalid. *Matter of Wells*,
22  113 N.Y. 396, 400 (1889). The *Penrose* court ultimately held that William's interest in
23  his sister's estate should pass to William's intestate heirs, because it was akin to a
24  possibility of reverter, a type of future interest that was not devisable by law at the time.
25  299 N.Y.S. at 846. The Surrogate's Court in *Penrose* did not touch on the issue here,
26  whether a will can devise a property right that is unquestionably that of the decedent but
27  which is acquired by the decedent after death, as opposed to an expected bequest still

28

1  controlled by another, subject to the rule of lapse.[2]

2      As the Tentative Order notes, California Probate Code Sections 21109-21110,

3  California's lapse and anti-lapse provisions, treat expectancies in a manner similar to

4  *Penrose*: "A transferee who fails to survive the transferor of an at-death transfer or until

5  any future time required by the instrument does not take under the instrument." Cal.

6  Prob. Code § 21109.  Under the anti-lapse provision, if the predeceasing transferee is

7  kindred of the transferor, the devise does not lapse, but passes to the transferee's issue.

8  Cal. Prob. Code § 21110.  This rule of lapse and its counterpart for family members are

9  *backward-looking* rules of construction—they answer the question of what a court

10  should do when it is confronted with a devise to a person, and the devisee is dead.[3]

11  Here, the court is examining whether property rights bestowed by the California

12  legislature could pass through the residual clause of Marilyn Monroe's will.  The lapse

13  and anti-lapse statutes do not apply, because there is no later will that needs to be

14  interpreted.  Instead, there is a residuary clause with intended beneficiaries, and a

15  defined property right granted by the legislature to the decedent after death.

16      In fact, there is no New York or California authority holding that property

17  acquired after a testator's death *cannot* pass through the residuary clause of a will.

18  Wade R. Habeeb, *Effect of Residuary Clause to Pass Property Acquired by Testator's*

19

---

20  [2] The holding of Penrose also relies on earlier case law, clearly at odds with current

21  New York Est. Powers & Trusts Law ("EPTL") § 6-5.1, finding that a possibility of

   reverter is not devisable or descendible. *Id.* at 846 (citing *Trustees of Calvary*

22  *Presbyterian Church of Buffalo v. Putnam*, 221 N.Y.S. 692 (1927)). EPTL § 6-5.1

   now states that "[f]uture estates are descendible, devisable and alienable, in the

23  same manner as estates in possession."

24  [3] If the devisee is kindred, Section 21110 assumes that the testator would have

   wanted the devisee's lineal heirs to take; if the devisee is not kindred, Section

25  21109 assumes that the testator would have wanted the transfer to fail.  Notably, if a

   devise is to a deceased beneficiary *or their estate*, both California and New York

26  would ***not*** apply lapse provisions, but would direct that the devise pass through the

   deceased beneficiary's will if one exists, or to the decedent's intestate heirs, unless

27  a contrary intent could be gleaned from the context and language of the devise. *See*

   *In re Brunet*, 34 Cal. 2d 105, 111 (1949); *In re Albert*, 445 N.Y.S. 2d 355 (Sup. Ct.

28  1981) (holding that testator did have contrary intention).

Gibson, Dunn &
Crutcher LLP

6

1 *Estate After His Death*, 39 A.L.R.3d 1390 (noting "dearth" of cases on point and citing

2 *In re Estate of Braman*, 258 A.2d 492 (Pa. 1969), as "the only case found."); 80 Am.

3 Jur. 2d Wills § 1168 (citing only *Braman* and contrasting it with *In re Hite*, 700 S.W.2d

4 713 (Tex. App. 1985)). As the Court's Order points out, *Braman* holds that a testator

5 cannot devise a mere expectancy, title to which vests after death. 258 A.2d at 494.

6 However, no court outside of Pennsylvania has applied *Braman* to statutory rights

7 granted to the decedent while probate is open, as Marilyn Monroe's was until 2001, and

8 only one court outside of Pennsylvania has cited *Braman* favorably.

9     In the *Braman* case, Ruth Braman died in 1963 and left to her sister Mary

10 Goddard a life interest in her residuary estate, with the remainder to be distributed to

11 various charities. 258 A.2d at 494. Mary Goddard died a year later. In her will, Mary

12 left her residual estate to her sister, "or her [sister's] estate." The Supreme Court of

13 Pennsylvania was presented with the question of whether Mary's residuary should pass

14 through Ruth's will, or should instead pass through intestacy to Mary's heirs. In a 4-3

15 decision, the court held that Mary's residuary could not be devised by Ruth's will,

16 because Ruth had no interest to devise at the time of her death. *Id.* Instead, according

17 to the majority, Ruth had a mere "expectancy" that could not be devised.

18     Notably, the *Braman* court, quoting the Restatement of Property, defined an

19 expectancy as "the chance of obtaining property by inheritance or by will from a person

20 now living. Such chances are not in themselves rights in property." *Id.* at 493 n.3. By

21 this definition, Ms. Monroe's interest in her right of publicity as of 1962 was not an

22 "expectancy." Instead, Ms. Monroe's right of publicity is at worst a remote and

23 unknown property right, which the *Braman* court acknowledges *may* be devised through

24 a residuary clause. *Id.* at 494.

25     The majority in *Braman* also recognizes the tension between its limited holding

26 and both the presumption against intestacy and the policy that a court should fulfill the

27 intent of the testator. 258 A.2d at 494. There is no logical, statutory, or policy reason

28 here why Marilyn Monroe's publicity rights should fall to intestacy, rather than passing

Gibson, Dunn &
Crutcher LLP

1   through her will during probate (which closed in 2001 after descendible publicity rights

2   were recognized by statute) to the intended beneficiaries of her residual estate.

3           Moreover, in accord with *Brunet, Albert*, and respective anti-lapse statutes,

4   neither California nor New York would follow *Braman*. Mary Goddard's will left her

5   residuary estate to her sister Ruth "or her [sister's] estate." The court in *Braman*

6   deemphasizes the importance of the alternative devise to Ruth's estate, but both the

7   California court in *Brunet* and the *Albert* court in New York interpreted similar

8   provisions devising property to a decedent's estate as directing that such property go to

9   legatees of the will of the person so designated, or to the person's heirs, absent evidence

10  of contrary intent by the testator. *See Brunet,* 34 Cal. 2d at 111; *Albert*, 445 N.Y.S. 2d

11  at 359. Such a devise would also pass to Ruth Braman under California and New

12  York's anti-lapse provisions. Cal. Prob. Code § 21110; EPTL § 3-3.4.

13          The Tentative Order also cites to EPTL § 3-3.1, which provides that "[u]nless the

14  will provides otherwise, a disposition by the testator of all his property passes all of

15  the property he was entitled to dispose of at the time of his death." Order at 14. The

16  Tentative Order omits the "[u]nless the will provides otherwise" language from its

17  quotation of EPTL § 3-3.1. Order at 14. However, Ms. Monroe did provide otherwise,

18  by including a residuary clause that bestowed "the rest, residue and remainder of my

19  estate… of which I shall die seized or possessed *or to which I shall be in any way*

20  *entitled.*" Declaration of Anna Strasberg in Support of Plaintiffs' Opposition to

21  Defendants' Motion for Summary Judgment ("Strasberg Decl."), Exhibit C (emphasis

22  added). The California Legislature also provided otherwise, by granting posthumous

23  rights of publicity retroactively and directing that they may pass via testamentary

24  documents. *See infra* Section III.

25          Section 3-3.1 (formerly N.Y. Decedent Estate Law §14 ("DEL"), and prior to

26  that, Section 5 of the N.Y. Statute of Wills) was enacted to change an anachronistic and

27  confusing common law rule that forced certain real property owned by an otherwise

28  testate decedent to pass by intestacy. Under the common law rule, if a decedent

1    acquired an interest in real property after executing his will, the will was ineffective to

2    transfer it.  The opposite result occurred with personal property acquired after execution

3    of the will—such "after acquired" personal property passed to the will's beneficiaries.

4    DEL §14, the predecessor to EPTL § 3-3.1, changed the common law rule so that real

5    property acquired between execution of the will and death would pass through the

6    estate.  The New York Supreme Court described DEL as providing "a more reasonable

7    rule," because it allowed the decedent's intentions to govern the distribution of real

8    property acquired after execution of the decedent's will.  *Hirsch v. Bucki*, 148 N.Y.S.

9    214, 218 (1914).

10        EPTL § 3-3.1 thus was enacted to "broaden" DEL §14, and to restate the

11    common law rule that "after acquired" personal property should pass through the will.

12    EPTL § 3-3.1, reviser's notes.  Thus, the language of Section 3-3.1 is not intended to

13    *limit* disposition of property acquired by a person's estate as the Tentative Order

14    suggests, but is intended to *expand* the disposition of property acquired between

15    execution of a will and death, which furthers the primacy of testamentary intent and

16    avoids intestacy.

17    **B.    Testamentary intent and avoidance of intestacy are paramount principles of**
18    **probate law.**

19        The primacy of testamentary intent is the guiding principle in the interpretation

20    of a will.  California recognizes the importance of testamentary intent in California

21    Probate Code § 21102(a), which states:  "The intention of the transferor as expressed in

22    the instrument controls the legal effect of the dispositions made in the instrument."  *See*

23    *also Newman v. Wells Fargo Bank*, 14 Cal. 4th 126, 134 (1996) ("The paramount rule in

24    the construction of wills, to which all other rules must yield, is that a will is to be

25    construed according to the intention of the testator as expressed therein, and this

26    intention must be given effect as far as possible.") (quoting *Estate of Wilson*, 184 Cal.

27    63, 66-67 (1920)); *Estate of Hermon*, 39 Cal. App. 4th 1525 (1995) (intention of testator

28    is "polestar" in interpretation of a will).  Construing a will according to testamentary

1  intent is a "cardinal rule," and other rules of construction are subordinate. *Estate of*
2  *Karkeet*, 56 Cal. 2d 277, 281 (1961) (quoting *In re Estate of Blake*, 157 Cal. 448, 458-
3  59 (1910)).  New York similarly acknowledges the supremacy of testamentary intent in
4  will interpretation. *E.g., In re Estate of Kosek*, 31 N.Y.2d 475, 483 (1973); *In re Estate*
5  *of O'Brien*, 627 N.Y.S.2d 544, 546 (Sur. Ct. 1995). The Restatement (Third) of
6  Property, Wills and Other Donative Transfers § 10.1 (1999) further emphasizes that
7  "[t]he controlling consideration in determining the meaning of a donative document is
8  the donor's intention. The donor's intention is given effect to the maximum extent
9  allowable by law."

10     As appropriately noted in the Tentative Order, a probate court also will
11  invariably attempt to construe a will in a manner that avoids intestacy. *O'Brien*, 627
12  N.Y.S.2d at 546; *see also In re Estate of Goyette*, 123 Cal. App. 4th 67, 74 (2004); Cal.
13  Prob. Code § 21120 ("Preference is to be given to an interpretation of an instrument that
14  will prevent intestacy or failure of a transfer, rather than one that will result in intestacy
15  or failure of a transfer").  This rule favors residuary devisees, and assumes that a testate
16  decedent did not intend for any part of her estate to pass through intestacy. *O'Brien*,
17  627 N.Y.S.2d at 546 ("The law favors a construction that a testator intended to make a
18  valid disposition of his entire estate.").  To that end, a court will construe a residuary
19  clause broadly and liberally as including a decedent's property in order to avoid
20  intestacy wherever possible, unless there is affirmative evidence of a contrary intent. *In*
21  *re Estate of Jones*, 38 N.Y.2d 189, 194 (1975); *Estate of Russell*, 69 Cal. 2d 200, 213
22  (1968); *see also O'Brien*, 627 N.Y.S.2d at 463.

23     It also is true that despite this strong presumption against intestacy, a "court
24  cannot create a testamentary disposition which is not expressed or readily implied." *In*
25  *re Williams' Will*, 221 N.Y.S.2d 799, 800 (Sur. Ct. 1961); *see also In re Klewer's*
26  *Estate*, 124 Cal. App. 2d 219, 224 (1954). Here, however, the testator's intent *is*
27  adequately expressed. Marilyn Monroe's residuary clause clearly expressed the breadth
28  of her intended disposition by giving not only all property of which she was seized, but

1  also all property "to which [she] shall in any way be entitled." Strasberg Decl., Ex. C.

2  She also expressly left other similar intellectual property rights, such as contractual

3  rights related to her motion pictures, to the residuary beneficiaries. *See infra* Section

4  II.C.

5       In contrast, the *Williams* court was confronted with a situation where the

6  testator's intent could not be fulfilled. The testator in *Williams* left half of her residuary

7  estate in trust to her niece, Anna Lewis. *Williams*, 221 N.Y.S.2d at 800. According to

8  the testator's will, upon Lewis's death, the corpus of the trust was to be split evenly

9  between Lewis's issue, and two other beneficiaries (or their issue). *Id.* The niece died

10  without issue, and the Surrogate's Court was faced with the question of whether the

11  niece's share should augment the shares of the other two beneficiaries or should fall to

12  intestacy.[4] The court applied the "long-established rule of construction that a residuary

13  gift to the issue of a life tenant who dies without issue devolves in intestacy provided

14  there is no substitutional gift," and found that because Lewis had no issue, there was no

15  devise of the one-third share of the trust, and that interest therefore fell to intestacy. *Id.*

16  Unlike *Williams*, here there was not any question of a later gift failing, or any difficulty

17  in effectuating the residuary clause during probate of the estate because Marilyn

18  Monroe expressly devised her residual estate to identifiable, living persons.

19       Furthermore, Marilyn Monroe expressly indicated that she intended that the

20  residuary estate include all property "to which I shall be in any way be entitled."

21  Strasberg Decl., Ex. C. In fact, Marilyn Monroe's will left only a specific devise of

22

23  [4] In the *Klewer* case, there was no residuary clause at all. Instead, the testator had
    written a two-sentence will leaving a piece of furniture and her "personal things" to
24  her neighbor, but there was no provision of the will stating what was to be done
    with the cash, stocks, bonds, real estate and other property that the testator owned at
25  her death. *Klewer*, 124 Cal. App. 2d at 220. The Court of Appeal applied the
    ordinary meaning of "personal things" and did not award the cash, stocks and real
26  estate to the neighbor, but allowed it to fall to intestacy. The court in *Klewer* had to
    wrestle with whether there was an intestacy because there was no residuary clause
27  to capture property not specifically enumerated. Had there been a residuary clause,
    the court in *Klewer* could easily have effectuated the testator's intent by awarding
28  the property to the residual beneficiary.

1  $100,000 in trust for her mother. Strasberg Decl., Ex. C. Under the proposed

2  interpretation of Ms. Monroe's will set forth in the Tentative Order, Ms. Monroe's

3  statutory posthumous rights of publicity would have fallen intestate to Ms. Monroe's

4  mother, if alive, and not to the residuary beneficiaries. Such a result is manifestly

5  contrary to Ms. Monroe's intent. Moreover, to deny the residuary beneficiaries those

6  rights is to favor intestacy, without any countervailing policies, and despite the liberal

7  interpretation that the law requires a court give a residuary clause in order to avoid

8  intestacy.

9  **C.    A residuary clause is effective to devise property acquired after death and**

10  **distributed prior to the close of probate.**

11  Even assuming that the right of publicity did not exist in 1962, the residuary

12  clause of Marilyn Monroe's will was effective to pass property rights acquired after

13  death, and before closure of probate, to the estate of Lee Strasberg and the other residual

14  beneficiaries. Relevant New York and California law expresses a willingness to allow

15  property acquired after death, including rights of publicity, to pass through a decedent's

16  will. *See Miller v. Glenn Miller Prods.*, 318 F. Supp. 2d 923 (C.D. Cal. 2004) *aff'd,*

17  *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975 (9th Cir. 2006); *In re Schunk*, No.

18  321397, 2005 N.Y. Misc. LEXIS 1312 (Sur. Ct. June 29, 2005); Cal. Prob. Code §

19  11642; EPTL § 11-1.1(b)(1). Moreover, the Restatement (Third) of Property, Wills and

20  Other Donative Transfers § 10.1 (1999) currently recognizes that a decedent's probate

21  estate "consists of property acquired by the decedent's estate at *or after the decedent's*

22  *death*." (emphasis added); *see also* Uniform Probate Code § 2-602 ("A will may provide

23  for the passage of all property the testator owns at death and all property acquired by the

24  estate after the testator's death.").

25  Both New York and California recognize by statute that an estate may acquire,

26  add, or discover property after the testator's death. *See* Cal. Prob. Code § 11642; EPTL

27  § 11-1.1(b)(1). In California, property "acquired or discovered" even after close of

28  probate is disposed of pursuant to the court order of final distribution, if the property

1   was subject to the order's terms (as through a residuary clause).  Cal. Prob. Code §

2   11642.  Similarly, New York probate law provides an executor with the capacity to

3   "accept additions to [the] estate from sources other than the estate."  EPTL § 11-

4   1.1(b)(1).  These rules underscore the importance of testamentary intent, and reinforce it

5   by ensuring that residuary beneficiaries actually receive anything and everything to

6   which the decedent was entitled, including property discovered, added, acquired or

7   adequately defined after death.  *See In re Hite*, 700 S.W.2d at 717 (Tex. App.-13th

8   1985) ("[O]ne of the functions of a residuary clause is to dispose of property that the

9   testator may have overlooked, property that lacked particular definition or property that

10  the testatrix did not know that she was entitled to at the time the will was executed.")

11      While not expressly deciding the instant issue, both *Schunk*, a recent case from

12  New York, and *Miller*, a recent case from this District Court, suggest that courts would

13  allow a statutory property right acquired after death to pass through a decedent's will.

14  In *Schunk*, for example, a New York Surrogate's Court directed that a portion of a

15  postmortem statutory award by the federal government to victims of the September 11th

16  attacks pass through the decedent's will.  *Schunk*, 2005 N.Y. Misc. LEXIS 1312 at *12.

17  Similarly, in *Miller*, Judge Matz of this Court considered Glenn Miller's posthumous

18  right of publicity under Section 3344.1 a property right that was devised through

19  Miller's residuary clause in 1944, licensed by the residual beneficiary in 1956, and

20  again conveyed through Miller's wife's residuary clause in 1966.  318 F. Supp. 2d at

21  927.

22      Although Marilyn Monroe died on August 5, 1962, her estate remained open

23  until June 19, 2001, on which date the Surrogate's Court of New York, where the

24  probate of Marilyn Monroe's will occurred, authorized Anna Strasberg, in her capacity

25  as Administratrix C.T.A. (an administrator appointed by the court to fulfill the duties of

26  the executor when a previous executor has died) of the Marilyn Monroe estate, to

27  "transfer all assets of the estate" to Marilyn Monroe LLC ("MMLLC"), a corporation

28

Gibson, Dunn &
Crutcher LLP

1  formed for the benefit of the residuary beneficiaries of the estate.[5] June 19, 2001

2  Decree on a Voluntary Final Accounting and Related Matters ("June 19, 2001 Decree")

3  at 4b, attached as Ex. E to the Supplemental Declaration of Anna Strasberg ("Strasberg

4  Supp. Decl."). The Petition filed by the administratrix requesting the issuance of the

5  June 19, 2001 Order included in its description of the assets of the estate Marilyn

6  Monroe's "Intellectual Property Rights," which were defined as "decedent's

7  participation rights in motion pictures and royalties from the licensing of the Decedent's

8  name, likeness and signature." Petition for Judicial Settlement of Final Account at ¶ 11,

9  attached as Ex. D to the Strasberg Supp. Decl.[6] Thus, the assets that the Surrogate's

10  Court authorized the administratrix to transfer included Marilyn Monroe's publicity

11  rights as well as other intellectual property rights.[7]

12     Recent case law and applicable probate statutes thus support just one conclusion:

13  a New York or California probate court would construe Ms. Monroe's postmortem

14

15  [5] The residuary clause of Marilyn Monroe's will provided that the residue of her
     estate was to be distributed as follows: (i) the lesser of $40,000 or 25 percent to
16   May Reis; (ii) 25 percent of the balance to Dr. Marianne Kris, one of her
     psychiatrists, and; (iii) the remainder to Lee Strasberg, her close friend and acting
17   coach. Strasberg Decl., Exhibit C. May Reis was paid $40,000, thereby making
     Mr. Strasberg's residual interest 75 percent. Strasberg Supp. Decl. ¶ 4. By June 19,
18   2001, both Mr. Strasberg and Dr. Kris had died. *See id.* The June 19, 2001 Decree
     directs that Mr. Strasberg's 75 percent residue interest in the Monroe Estate be
19   distributed to his estate (of which Anna Strasberg was executrix as well) and Dr.
     Kris' 25 percent be distributed to the Anna Freud Centre, a non-profit foundation
20   that was the beneficiary under Dr. Kris' will. June 19, 2001 Decree, Ex. 10 to
     Supplemental Strasberg Declaration, at 3-4.

21
22  [6] In the Petition, the administratrix informed the Surrogate's Court that MMLLC was
     being created to hold Ms. Monroe's publicity rights and other Intellectual Property
22   Rights. Strasberg Supp. Decl. ¶ 8, Ex. D at § 1.2, p.1. Moreover, as shown by
     accountings covering the period 1980 to 2001, for decades the Surrogate's Court
23   supervised and approved the collection and the distribution to the residuary
     beneficiaries of royalties generated by the estate's exercise of Ms. Monroe's
24   publicity rights. *Id.* at ¶¶ 5, 7, Exs. A & C at Schedule A-2 in both accountings.

25
26  [7] Not only did the Surrogate's Court order that these publicity rights be distributed to
     MMLLC in 2001, but for many years prior to that Defendants worked with
26   Plaintiffs on licensing deals and expressly acknowledged Plaintiffs' rightful
     ownership of Marilyn Monroe's publicity rights, thereby estopping them from
27   asserting now that Plaintiffs do not own these rights. *See* Plaintiffs' Opposition to
     Defendants' Motion for Summary Judgment at 41-48 and evidence cited therein.

28

1  rights of publicity as within the ambit of her residuary clause. The authorities in the

2  Tentative Order, which all involve factual scenarios with critical legal distinctions,

3  would not guide a New York or California probate court in the case at hand, where

4  property rights are defined and awarded after a testator's death, and where intent can be

5  ascertained. Therefore, even assuming that Marilyn Monroe had no right of publicity to

6  devise in 1962,[8] Lee Strasberg and the other residuary beneficiaries (whose interests

7  have been poured into MMLLC) were entitled to any property rights bestowed upon

8  Marilyn Monroe after death and before closure of the probate estate in 2001.

---

[8]  The Tentative Order states that under *Lugosi v. Universal Pictures*, 25 Cal. 3d 813 (1979), California did not recognize a posthumous right of publicity prior to the passage of Civil Code Section 3344.1 in 1984. Tentative Order at 15-16 n. 31. While Plaintiffs acknowledge the authority supporting that interpretation of *Lugosi* (*see Comedy III Productions v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 391 (2001), and *Gugliemi v. Spelling-Goldberg Prods.*, 25 Cal. 3d 860, 861 (1979)), they also note that other courts and commentators have interpreted *Lugosi* as holding that celebrities, such as Marilyn Monroe, who actually exploited their name and likeness during their lifetime may very well have a descendible common law right of publicity. *See Acme Circus Operating, Inc. v. Kuperstock*, 711 F.2d 1538, 1543-44 (11th Cir. 1983) (applying California law and finding the right of publicity to be descendible under *Lugosi* to the extent it was exploited during the celebrity's lifetime in relation to a specific product or service); *see also Groucho Marx Prods., Inc. v. Day and Night Co.*, 689 F.2d 317, 323 (2d Cir. 1982) (stating that *Lugosi* could be interpreted as allowing a post-mortem right of publicity to the extent that the right was exercised during life by the deceased personality, but not deciding the issue since there was no exercise during life in that case). A leading treatise on publicity rights states "[t]he majority opinion in the 1979 *Lugosi* case was unclear as to whether there ever could be any postmortem common law right of publicity in California." J. Thomas McCarthy, The Rights of Publicity and Privacy § 6:39, at 871 (2d ed. 2006). Indeed, the legislative history behind the amended version of what is now Civil Code Section 3344.1 that was passed in 1984 indicates that the California legislature was seeking to clear up this confusion by amending the statute to state clearly that the right of publicity was a property right that was descendible. Siegel Supp. Decl. ¶ 5, Ex D. It cannot be reasonably disputed that Marilyn Monroe actively and extensively commercially exploited her name and image during her lifetime. Examples of just a few of the advertisements in which she appeared and contracts where she reserved those rights are submitted herewith. *See* Siegel Supp. Decl. ¶¶ 2-4, Exs. A-C; Declaration of Daniel Siegel in Support of Plaintiffs' Supplemental Brief in Support of Pls. Opp'n to Defs.' Motion for Summary Judgment Ex. A at 23-25, Ex. B at 8-9. Therefore, under one interpretation of *Lugosi*, Marilyn Monroe's wide-ranging exploitation of her name and image during her lifetime entitled her to a descendible common law right of publicity in California.

Gibson, Dunn & Crutcher LLP

### III.   CALIFORNIA'S POSTHUMOUS RIGHT OF PUBLICITY STATUTE SHOULD BE READ TO ALLOW PERSONS WHO DIED PRIOR TO 1985 TO DEVISE THEIR RIGHTS.

The Tentative Order also relies on the assertion that both "the California and Indiana posthumous right of publicity statutes recognize the fact that an individual (a "personality") cannot bequeath a statutory property right that she did not possess at the time of her death." Tentative Order at 16, citing Cal. Civ. Code Section 3344.1(b)-(d) and Ind. Code §§ 32-36-1-16 to -18.  Plaintiffs respectfully submit that this interpretation of these statutes is contrary to the plain language of the statutes themselves, as well as the evidence as to how courts and devisees of deceased personalities have applied the statutes in practice since they were passed.

California Civil Code Section 3344.1(b) provides:

The rights recognized under this section are property rights, freely transferable, in whole or in part, by contract or means of trust or testamentary documents, whether the transfer occurs before the death of the deceased personality, by the deceased personality or his or her transferees, or, after the death of the deceased personality, by the person or persons in whom the right vests under this section or the transferees of that person or persons.

Cal. Civ. Code § 3344.1(b).  As the statute expressly provides for transfers of post-mortem publicity rights by deceased celebrities through testamentary documents, such transfers are effective so long as the deceased celebrity during his or her life provided for such a transfer in a will or other testamentary document, either through a specific bequest or through a residuary clause, as such a "transfer" cannot be completed until a time after death.

The Tentative Order reads the statute to mean that unless a transfer occurs "on or before" the personality's death by means of contract, trust or testamentary document, then the rights vest directly in the familial heirs specified in subsection (d) of the statute. Tentative Order at 16.  But the words "on or" do not appear anywhere in subsection (b),

Gibson, Dunn & Crutcher LLP

1  which by its language provides only for transfers by deceased personalities "before"

2  their death by contract § means of trust or testamentary documents.  If a transfer were

3  required to actually occur before a deceased personality's death, then there could never

4  be an effective transfer by a deceased personality under testamentary documents (or

5  under any contract that by its terms makes a transfer effective after the death of a

6  deceased personality)..  This is contrary to the expressed intent of the statute to permit

7  such transfers.  Nor is a specific bequest in a will necessary to provide for an effective

8  transfer – a residuary clause is a well-established manner to transfer property not

9  specified in specific bequests, whether known or unknown, immediate or remote.

10       In addition, Section 3344.1 provides for a single class of deceased personalities

11  who are covered by the statute, namely any natural person "whose name, voice,

12  signature, photograph, or likeness has commercial value at the time of his or her death"

13  and "who has died within 70 years prior to January 1, 1985."  Nothing in the statute

14  indicates that deceased personalities who died between January 1, 1915 and January 1,

15  1985 were to be treated differently than those who died after January 1, 1985 in terms of

16  their ability to have their publicity rights passed in accordance with their testamentary

17  intentions through a will.

18       While subsection (d) of Civil Code Section 3344.1 does provide for the vesting

19  of postmortem publicity rights directly in certain specified familial heirs, the statute

20  expressly makes vesting under this subsection "[s]ubject to subdivisions (b) and (c)

21  above."  Cal. Civ. Code § 3344.1(d).  Thus, the vesting provisions of subdivision (d)

22  apply *only* if a deceased personality has made no transfer in a contract, trust or

23  testamentary document during his or her life.  The language of the statute evinces a

24  clear intent by the legislature to favor testamentary disposition over intestacy.  Yet the

25  view of the statute set out in the Tentative Order would mean that, despite the

26  legislature's intention that intestacy be a last resort, the publicity rights of every

27  deceased personality who died between January 1, 1915 and December 31, 1984 would

28  be distributed through the intestacy provisions of subsection (d), even if the personality

1 died with a valid will containing a residuary clause and even if such distribution

2 contravened their testamentary intent as expressed in their will. Given that the statute

3 expressly provides for retrospective application to personalities who died as many as 70

4 years before the statute became effective, had the legislature intended to exclude dead

5 personalities from the rules allowing for transfer under subsection (b), it would simply

6 have provided that the distribution of the publicity rights for deceased celebrities who

7 died before January 1, 1985 was governed by subsection (d).[9]

8        In addition, the statute has been applied in accordance with Plaintiffs'

9 construction in practice by this Court and by the devisees of deceased personalities who

10 died before January 1, 1985. In *Miller v. Glenn Miller Productions, Inc.*, 318 F. Supp.

11 2d 923 (C.D. Cal. 2004), *aff'd, Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975

12 (9th Cir. 2006), although the issue presented here was not discussed, Judge Matz found

13 that the right of publicity under Section 3344.1 was a property right that was devised

14 through a residuary clause in 1944, licensed by the residual beneficiary in 1956, and

15 again conveyed through a residuary clause in 1966. In 1944, the popular musician and

16 band leader, Glenn Miller, devised his postmortem right of publicity to his wife, Helen

17 Miller, through his residuary clause. *See id.* at 927. Mrs. Miller thereafter devised Mr.

18 Miller's posthumous publicity rights through her residuary clause in 1966. *See id.* at

19 928. In 1956, Mrs. Miller entered into a contract with the defendant conveying Glenn

20 Miller's posthumous publicity rights and trademarks.

21        The *Miller* court held, as a matter of law, that Mrs. Miller conveyed a valid

22 license of Glenn Miller's posthumous publicity rights in 1956 to the defendant. *Id.* at

23 935 ("[T]he Court finds that 1956 agreement is susceptible of only one reasonable

24

25 [9] The Indiana right of publicity statute specifically provides that if the rights are not transferred by will (or other method), then they fall via intestate succession. The

26 same reasoning, therefore, would apply to the Indiana statute – the legislature did not intend that all previously dead celebrities would have no right to control

27 disposition of their proprietary publicity rights, but if a dead personality did not provide for disposition of her assets, those assets would descend through intestate

28 succession.

1   interpretation – that it conveys both a trademark license and a license of Glenn Miller's
2   publicity rights."); *see also id.* at 939 ("[B]ecause the 1956 license agreement does not
3   grant [defendant] express permission to unilaterally sub-license Glenn Miller's publicity
4   rights, [defendant] may not do so."). Necessary to the *Miller* court's findings was that
5   Mrs. Miller had Mr. Miller's posthumous publicity rights to convey in the first place
6   and that those rights passed through Mr. Miller's residuary clause in 1944 and
7   subsequently to Mrs. Miller's two adopted sons through her residuary clause in 1966.

8        Under the principles of the Tentative Order, courts would not, as Judge Matz
9   did, apply the residuary clauses of deceased personalities who died before 1985 to
10  determine the ownership of their rights of publicity. Instead, they would be compelled
11  to look to the specified familial heirs listed in the statute. It is unclear whether the
12  rights would vest in Mrs. Miller's adopted sons if the statutory scheme applied rather
13  than the residuary clauses. However, even if the result would be the same in *Miller*, that
14  may not always be the case. Given the large number of celebrities who died prior to
15  1985, it is likely that the rightful ownership in many instances would be in question or
16  altogether terminated. For example, Albert Einstein's statutory right of publicity is
17  registered with the California Secretary of State to the Hebrew University of Jerusalem
18  ("Hebrew University"), a university co-founded by Einstein, who died in 1955 but is
19  still is one of the highest earning deceased personalities. *See* Siegel Supp. Decl. ¶¶ 6-8,
20  Exs. E-G. Under the holding of the Tentative Order, the Hebrew University would be
21  divested of Albert Einstein's very valuable right of publicity, contrary to his
22  testamentary intent, because the Hebrew University is not one of the specified familial
23  heirs under the statute.[10]

24

25  [10] Other deceased personalities who died before 1985 whose estates may be affected
26     by the Tentative Order's application of Section 3344.1 are: (1) Truman Capote,
    whose right of publicity claimant via his will is Alan U. Schwartz, his longtime
27     friend and literary executor, who would not be one of the specified heirs under the
    statute; and (2) Al Jolson, who distributed by will all of his assets, including his
28     right of publicity to 18 different charities, universities and civic organizations, none
                                            [Footnote continued on next page]

Gibson, Dunn &
Crutcher LLP

# IV.    CONCLUSION

For all of the foregoing reasons and for the reasons stated in Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, Defendants' Motion for Summary Judgment should be denied.

DATED: December 18, 2006

Respectfully submitted,

William E. Wegner
Amnon Z. Siegel
GIBSON, DUNN & CRUTCHER LLP

By:    _____
        William E. Wegner

Attorneys for Plaintiff,
MARILYN MONROE LLC

Jonathan G. Polak (admitted *pro hac vice*)
SOMMER BARNARD P.C.

By:    _____
        Jonathan G. Polak

Attorneys for Plaintiff,
CMG WORLDWIDE, INC.

100134285_1.DOC

_____

[Footnote continued from previous page]
    of which would be specified heirs under the statute.  *See* Siegel Supp. Decl. ¶¶ 9-11, Exs. H-J.

Gibson, Dunn &
Crutcher LLP