# Exhibit 6

768

*To be argued by*
**FRANK R. CURTIS**

New York County Clerk's Index No. 01527/75

# New York Supreme Court

APPELLATE DIVISION—FIRST DEPARTMENT

DO NOT CIRCULATE

JUN 3 1980

N.Y.S. LAW LIBRARY

---

**AARON FROSCH,**
Executor of the Estate of Marilyn Monroe,

*Plaintiff-Appellant.*

—against—

GROSSET & DUNLAP, INC., ALSKOG, INC., NORMAN MAILER,
LAWRENCE SCHILLER and ALLEN HURLBURT,

*Defendants-Respondents.*

---

## BRIEF FOR DEFENDANT-RESPONDENT
## NORMAN MAILER

---

REMBAR & CURTIS
*Attorneys for Defendant-Respondent*
*Norman Mailer*
19 West 44th Street
New York, New York 10036
(212) 575-8500

## TABLE OF CONTENTS

|  | Page |
|---|---|
| INTRODUCTORY STATEMENT | 1 |
| COUNTERSTATEMENT OF QUESTIONS INVOLVED | 2 |
| ARGUMENT | 3 |
| Point I – There is no descendible common law right of publicity in New York | 3 |
| Point II – An action for "fictionalization" under the "false light" tort does not survive the death of the individual portrayed | 15 |
| Point III – The allegations in this case would not establish a cause of action under the "false light" tort even if that tort did extend to accounts of a deceased person's life | 21 |
|    A.  Frosch disavowed any "false light" claim | 21 |
|    B.  The claims actually advanced in the Complaint are not actionable | 25 |
|    C.  The statements cited in Frosch's brief do not establish a cause of action under the "false light" tort. | 35 |
| CONCLUSION | 47 |

## INTRODUCTORY STATEMENT

This is an action by Aaron Frosch ("Frosch"),
executor of the estate of Marilyn Monroe, against the
author Norman Mailer ("Mailer"), the publisher Grosset &
Dunlap, Inc. ("Grosset") and others involved in the publi-
cation of a biography of Miss Monroe.  The book, entitled
Marilyn, was published in 1973  more than ten years after
Miss Monroe's death.  The executor claims that the publi-
cation of this biography infringes a "right of publicity"
in Miss Monroe's name and likeness which is the property of
her estate.

The present action was commenced in 1975.  Three
years later, defendants moved for summary judgment.*  The
court below granted that motion, and Frosch has appealed.

The "Statement of Facts" in Frosch's brief is not,
of course, a statement of "facts" at all.  It is simply part

---

*Frosch's brief states (p. 15) that summary judgment was
granted "even before discovery has been completed".  There
is no dispute in the record that discovery was incomplete
after three years because Frosch himself refused to
answer questions (Curtis affid. ¶3 at A46).



of his argument, without legal citations. However, no counterstatement of the facts is necessary. The primary "fact" is the book itself, which was among the papers submitted to the court below (A9). (The purported quotations from the book in Frosch's "Statement of Facts" are discussed at pages 39 to 46 below.) Although Frosch claims the book is "fictionalized," he did not offer a single affidavit from any party claiming to have knowledge of the events recounted in the book.

## COUNTERSTATEMENT OF QUESTIONS INVOLVED

There are three questions involved in this appeal. If _any_ of these three questions is decided in favor of Respondents, the decision below must be affirmed.

1.  Is a descendible common law "right of publicity" recognized under the law of New York in any circumstances? The court below did not decide this question.

2.  Even if such a "right of publicity" were recognized in New York in certain circumstances, would a claim for substantial "fictionalization" of an individual's life story be the type of claim which survives death? The court below correctly held that such a claim would not survive death.



3. Even if such a claim did survive death, could such a claim be maintained on the facts of this case? The court below correctly decided that such a claim could not be maintained on the facts presented here.

ARGUMENT

<u>Point I: There is no descendible common law right of publicity in New York</u>

Sections 50 and 51 of the New York Civil Rights Law give to a living person a "right of privacy" against the un-authorized use of his name and likeness for advertising purposes or for purposes of trade. The decisions of the New York courts, discussed further below, make clear that this statutory right is exclusive. The supposedly descendible common law right upon which Appellant Frosch relies simply does not exist in New York. (Indeed, as pointed out below, even in those states where a common law right has been recognized, it has generally been held <u>not</u> to survive the death of the individual named or portrayed.)

The Court below rested its decision upon the narrower basis that at least the sort of "right of privacy" relied upon by Frosch in this case -- namely, the "false light"

-3-



tort giving an individual a right against the substantial "fictionalization" of his life story -- does not survive death (A14). This narrower basis will be discussed in Point II below. In addition, affirmance would be required on the facts of this case, even if that right did survive death (see Point III below). However, since Frosch's entire case depends upon a mistaken premise that there is a descendible common law right in New York, this broader defect should be addressed at the outset.

Before considering the specific question of whether there is a descendible common law right in New York, it may be helpful to review briefly the history and nature of the right of privacy, including the purported common law "right of publicity" upon which plaintiff relies.

A relatively new concept in the law, the right of privacy has developed slowly since the appearance in 1890 of a law review article by Samuel D. Warren and Louis D. Brandeis urging the recognition of such a right. See Warren & Brandeis, "The Right to Privacy," 4 Harv. L. Rev. 193 (1890). A right of privacy is now recognized, to some degree at least, by nearly all of the states. Prosser, Law of Torts §117, at 804 (4th ed. 1971).

-4-

In fact, the phrase "invasion of privacy" covers four separate though somewhat related torts, which Dean Prosser has labelled (1) "intrusion," (2) "public disclosure of private facts," (3) "false light in the public eye" and (4) "appropriation." Prosser's categorization and description of these four torts have been quoted with approval in both federal and New York decisions. See, for example, Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562 (1977); Factors Etc., Inc. v. Pro Arts, Inc., 579 F. 2d 215 (2d Cir. 1978) cert. denied, 440 U.S. 908 (1979); Nader v. General Motors Corp., 57 Misc. 2d 301 (Sup. Ct. N.Y. Cty. 1968), aff'd 31 App. Div. 2d 392 (1st Dept. 1969), aff'd 25 N.Y. 2d 560 (1970). Prosser's four categories have also been adopted in the Restatement Second of Torts §652 (1977).

"Intrusion," the first of these torts, is concerned with the invasion of an individual's physical solitude or seclusion -- e.g., invasion of the home, peering through windows, wire-tapping. Prosser, supra, at 807-808. The second tort, "public disclosure of private facts," consists of the publication, in a "highly objectionable" way, of private information about an individual, causing him emotional distress. Id. at 809. The third tort, "false light in the public eye,"

2677



involves the publication of substantially fictionalized
accounts of an individual's life. The "false light" tort is
thus a close cousin of the tort of defamation. See id. at
813. The last of these four torts, "appropriation," consists
of another's use of an individual's name or likeness for
advertising or other commercial purposes. Id. at 804. The
effect of this tort is to create "an exclusive right in the
individual plaintiff to a species of trade name, his own,
and a kind of trademark in his likeness." Id. at 807.

It is this final right, labelled "appropriation"
by Prosser, which others have sometimes referred to as the
"right of publicity."

> "The fourth type, appropriation of plaintiff's
> name or likeness for defendant's benefit, has
> in recent years acquired the label, right of
> publicity." Factors Etc., Inc. v. Pro Arts,
> Inc., 579 F.2d 215, 220 (2d Cir. 1978); and
> see Zacchini v. Scripps-Howard Broadcasting
> Co., 433 U.S. 562 (1977).

The general question of whether a common law right
of privacy should be recognized in New York was first con-
sidered by the Court of Appeals in 1902 in Roberson v.
Rochester Folding Box Co., 171 N.Y. 538. Roberson involved
the most blatant possible appropriation of plaintiff's likeness --
defendants used plaintiff's picture, without her permission, in

-6-

2678



a multitude of advertisements for their flour. Nonetheless, the Court of Appeals held that there was no common law right against such misappropriation. It noted the problems involved in deciding the scope of such a judicially created right and invited the Legislature to enact an appropriately limited remedy, if it saw fit. 171 N.Y. at 545, 555.

Of particular interest to the present case is that the Court of Appeals specifically noted that it had already held that, even if such a right did exist at common law, that right ceased upon the death of the individual portrayed and did not pass to his descendants. 171 N.Y. at 551, discussing Schuyler v. Curtis, 147 N.Y. 434 (1895).

The Legislature responded to the Court of Appeals' suggestion by enacting in 1903 the statutory provisions now contained in Civil Rights Law §§50-51. As the Court of Appeals had suggested, the statutory right was a strictly limited one. Section 50 makes it a misdemeanor to use the name or picture of a living person for advertising purposes or purposes of trade, and section 51 creates a private cause of action on the part of the individual named or portrayed in that manner. This limited statutory right is thus a purely personal right. It cannot be assigned (Rosemont Enterprises, Inc. v. Urban

2679



Systems, Inc., 72 Misc. 2d 788 (Sup. Ct. N.Y. Cty. 1973));

and it does not survive the death of the individual whose name

or likeness is used (Schumann v. Loew's Inc., 135 N.Y.S. 2d

361 (Sup. Ct. N.Y. Cty. 1954)).

The Court of Appeals has never varied from its

decision in Roberson that there is no common law right of

privacy or publicity in New York.  In the absence of a statute,

it might (or might not) have reconsidered in later years its

absolute rejection of such a right in circumstances as blatant

as those presented in the original Roberson case.  However,

once the Legislature had acted and set statutory limits on

the right of privacy, the Court of Appeals and the lower New

York courts properly recognized that the Legislature had pre-

empted the field.  The right of privacy in this State "rests

solely in and is limited by statute".  Flores v. Mosler Safe

Co., 7 N.Y. 2d 276, 280 (1959); Kiss v. County of Putnam, 59

App. Div. 2d 773 (2d Dept. 1977).*

---

*One of those limits is that any privacy action must be brought
within one year.  CPLR 215(3).  We believe the same statute of
limitations would be applied if a common law right of publicity
were recognized in New York, but there are (understandably) no
decided cases on this question.  If a longer period were per-
mitted, the statutory limits imposed by the New York legislature
could be evaded in this respect, as well as others.  In the
present case, although the order appealed from is not based on
the statute of limitations, the action was in fact commenced
well over a year after the publication at issue.  See A23, 27,
28.

-8-

However, beginning in the early 1950's, the federal courts were presented with an occasional case in which plaintiff attempted to evade the restrictions of the New York statute (primarily the fact that it created a non-assignable personal right) by arguing that there should also be recognized a parallel common law "right of publicity" in New York.  The federal courts accepted that argument, despite the fact that this so-called "right of publicity" was aimed at precisely the same kind of commercial appropriation of name and likeness which the New York Court of Appeals had held in Roberson was not actionable at common law and for which the New York Legislature had fashioned a statutory right (but a limited right) in sections 50 and 51 of the Civil Rights Law.  See Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc., 202 F.2d 866 (2d Cir. 1953), cert. denied 346 U.S. 816 (1953).  And twenty-two years later, in 1975, a district court judge held for the first time that this common law right of publicity might not end with the death of the individual named or portrayed.  Price v. Hal Roach Studios, Inc., 400 F. Supp. 836, 844 (S.D.N.Y. 1975).

In the years immediately after the Topps Chewing Gum case in 1953, the New York Court of Appeals had no occasion to consider the correctness of the federal court's

-9-



conclusion, though lower New York courts expressed their doubts about the existence of any common law right of publicity in New York. See, for example, Paulsen v. Personality Posters, 59 Misc. 2d 444 (Sup. Ct. N.Y. Cty. 1968).

However, within the last few years, the Court of Appeals has been presented with such common law claims and has rejected those claims firmly and unequivocally. In Wojtowicz v. Delacorte Press, N.Y.L.J. August 26, 1976, p. 5, col. 5, (Sup. Ct. N.Y. Cty.), Special Term held that plaintiffs' claim did not fall within the terms of New York's "severely limited right of privacy statute", but argued that the Roberson decision had been "eroded" by later federal decision and that a common law claim might exist "irrespective of the limiting provisions of the Civil Rights Law." Ibid. at p. 6, col. 1. The Appellate Division reversed and dismissed those causes of action, and the Court of Appeals affirmed that dismissal.

> "[W]hatever may be the law in other juris-
> dictions with respect to the right to judicial
> relief for invasion of privacy in consequence
> of unreasonable publicity, in our State thus
> far there has been no recognition of such right
> other than under sections 50 and 51 of the Civil
> Rights Law. (See Nader v. General Motors Corp.,
> 25 N.Y. 2d 560, 573 [concurring opinion of
> Breitel, J.]; Flores v. Mosler Safe Co., 7 N.Y.
> 2d 276, 280.)" Wojtowicz v. Delacorte Press,
> 43 N.Y. 2d 858, 860 (1978).

-10-



Subsequent New York decisions have repeated that there is no common law right in this State. Any right against the use of an individual's name or picture is purely statutory. Cohen v. Hallmark Cards, 45 N.Y. 2d 493, 497 n.2 (1978); Matter of Dora P., 68 App. Div. 2d 719, 730 n. 2 (1st Dept. 1979).* Subsequent federal decisions applying New York law have also followed Hojtowicz, though they have noted a possible limited exception for extreme physical intrusion, on the theory that a cause of action for such intrusion was recognized in New York even before Roberson and the enactment of Civil Rights Law 750 and 51. Lutz v. Hoffman, ____ F. Supp. ____, 4 Media Law Reporter 2294, 2296 (E.D.N.Y. 1979); Birnbaum v. United States, 588 F. 2d 319, 324 n. 3 (2d Cir. 1978).**

---

*The statement in Lombardo v. Doyle, Dane & Bernbach, Inc., 58 App. Div. 2d 749 (2d Dept. 1977) that there is a descendible right of publicity in New York was dictum (since the plaintiff was still alive) and the Second Department's decision in Lombardo was plainly overruled by the Court of Appeals' decision in Hojtowicz in the following year.

**In Factors Etc., Inc. v. Pro Arts, Inc., 579 F.2d 215 (2d Cir. 1978), the Second Circuit followed the earlier Southern District decision in Price v. Hal Roach Studios and held that there was a descendible common law right in New York. But the Factors case was decided only four months after Hojtowicz and the Second Circuit's opinion makes clear that Hojtowicz was not considered. Moreover, in Factors

[footnote continued on following page.]

-11-

2683

It is worth noting that, even where a common-law right has been recognized, the most recent opinions (and, we submit, the better reasoned opinions) have held that such right does not survive the death of the individual named or portrayed. Memphis Development Foundation v. Factors Etc., Inc., ___ F.2d ___ (Sixth Cir. 1980); Lugosi v. Universal Pictures, ___ Cal. 3d ___, 603 P. 2d 425, 5 Media Law Reporter 2185 (1979).*  The Sixth Circuit explained as

---

[footnote continued from previous page]

the Court stressed that the right had been licensed during the subject's life and the question was whether that exclusive license remained valid after his death. 579 F. 2d at 221-222. An assignment of the right during life is the "touchstone" of those few cases which have recognized a descendible right. Memphis Development Foundation v. Factors Etc., Inc., ___ F.2d ___ (Sixth Cir.) (slip opinion of March 6, 1980 at p. 3). Here, Frosch has admitted that he knows of no such licenses during Marilyn Monroe's lifetime (A 70-71) (the "Milton Green arrangement" mentioned at A 71 was for a book authored or co-authored by Miss Monroe, A 71-72, and was licensed long after her death, A 60).

*As noted above, even before the New York Court of Appeals held that a common law right should not be recognized in New York, that Court had ruled that any such alleged right would not be descendible in any event. Roberson v. Rochester Folding Box Co., 171 N.Y. at 551, discussing Schuyler v. Curtis, 147 N.Y. 434 (1895).

-12-

2684



follows the reasons for holding that the common law right
is not descendible:

> "...[T]here are strong reasons
> for declining to recognize the inherita-
> bility of the right.  A whole set of
> practical problems of judicial line-drawing
> would arise should the courts recognize
> such an inheritable right.  How long would
> the "property" interest last?  In perpetuity?
> For a term of years?  Is the right of publi-
> city taxable?  At what point does the right
> collide with the right of free expression
> guaranteed by the first amendment?  Does the
> right apply to elected officials and mili-
> tary heroes whose fame was gained on the
> public payroll, as well as to movie stars,
> singers and athletes?... Our legal system
> normally does not pass on to heirs other
> similar personal attributes even though the
> attributes may be shared during life by others
> or have some commercial value.  Titles, offices
> and reputation are not inheritable.  Neither
> are trust or distrust and friendship or enmity
> descendible.  An employment contract during life
> does not create the right for heirs to take over
> the job.  Fame falls in the same category
> as reputation; it is an attribute from which
> others may benefit but may not own.

> "The law of defamation, designed to pro-
> tect against the destruction of reputation in-
> cluding the loss of earning capacity associated
> with it, provides an analogy.  There is no
> right of action for defamation after death.
> See Restatement (Second) of Torts § 560 (rev.
> ed. 1977).  The two interests that support
> the inheritability of the right of publicity,
> namely, the "effort and creativity" and the
> "hopes and expectations" of the decedent,
> would also support an action for libel or
> slander for destruction of name and reputation
> after death.  Neither of these reasons, how-
> ever, is sufficient to overcome the common law
> policy terminating the action for defamation
> upon death."  (Slip opinion, March 6, 1980, at
> 5-6)  (Docket No. 79-1270).

2685



See also <u>Lugosi v. Universal Pictures</u>, 603 P. 2d at
430-431.*

In New York, there is an even stronger reason
to avoid the problems of such judicial line-drawing.
The New York Legislature has already delineated by
statute those uses of an individual's name or likeness
which are actionable in this State. The Legislature
limited the statutory right under Civil Rights Law
§50 and 51 to living persons and that limitation should
not be evaded by judicially creating a common law right
under a different name.

---

*The dissenting opinion in <u>Lugosi</u> suggested that the
duration problem could be solved by imposing a limit
of fifty years after the subject's death. 603 P. 2d
at 446-447. It is hard to imagine a more flagrant
example of attempted judicial legislation.

-14-

2686



**Point II:  An action for "fictionalization"
under the "false light" tort does not survive
the death of the individual portrayed.**

Even in those jurisdictions which do recognize
a descendible common law "right of publicity," that right
is distinct from the so-called "false light" tort upon
which plaintiff here relies.  The decided cases in all
jurisdictions are unanimous in holding that the latter
right ceases with the death of the party portrayed.

As noted in Point I above, the so-called
"false light" tort consists in the publication of fiction-
alized versions of a person's life, and is one of four torts
commonly subsumed within the phrase "invasion of privacy."
The "false light" tort is closely akin to an action for
libel and slander and subject to similar constitutional
restraints.  In both types of action, a public figure may
recover only if he can allege and prove that defendants pub-
lished what they knew to be false or acted with reckless
disregard for truth  or falsity.  As to defamation actions,
see <u>Gertz</u> v. <u>Robert Welch, Inc.</u>, 418 U.S. 323 (1974).  As
to "false light" privacy actions, see <u>Time, Inc.</u> v. <u>Hill</u>,
385 U.S. 374 (1967).

2687

As also explained in Point I, invasion of the
"right of publicity" is another name for the tort which
Prosser called "appropriation."  Invasion of the "right
of publicity" is thus a distinct tort from "false light"
and rests upon a very different basis.  The United States
Supreme Court emphasized the distinct bases for these
two torts in <u>Zacchini</u> v. <u>Scripps-Howard Broadcasting Co.</u>,
433 U.S. 562, 573 (1977):

> "'The interest protected' in permitting
> recovery for placing the plaintiff in a
> false light 'is clearly that of reputa-
> tion, with the same overtones of mental
> distress as in defamation.'  Prosser,
> [Privacy], 48 Calif. L. Rev. [383], at
> 400.  By contrast, the State's interest
> in permitting a 'right of publicity' is
> in protecting the proprietary interest
> of the individual in his act in part to
> encourage such entertainment."

Indeed, those few courts which have held the "right
of publicity" to be descendible have rested their conclusion
on precisely this difference.  The right of publicity, they
have argued, might be thought to rest on a "property" basis
somewhat analogous to trademark and therefore survive death,
whereas the other privacy torts rest only on injury to feeling
and are universally recognized to terminate at death.  As to
those other privacy torts (including "false light"), "... death
is a logical conclusion to any such claim."  <u>Factors Etc., Inc.</u>

-16-

v. Pro Arts, Inc., 579 F.2d 215, 221 (2d Cir. 1978); Price
v. Hal Roach Studios, Inc., 400 F. Supp. 836, 844 (S.D.N.Y.
1975).

The California Supreme Court recently dealt with
precisely this question in Guglielmi v. Spelling Goldman
Productions, ____ Cal.3d __ , 603 P.2d 454, 5 Media Law
Reporter 2208 (1979), involving a fictionalized film version
of Rudolph Valentino's life. The unanimous court held that
there was no "false light" tort after the death of the indi-
vidual involved. A majority of the court reached that con-
clusion based upon its conclusion in the Lugosi case (cited
in Point I above) that the entire common law right recognized
in California (all four privacy torts) expires upon the death
of the person so portrayed. The remaining members of the court,
in a concurring opinion by Chief Justice Bird, held that even
if a right of publicity did survive, that right would not ex-
tend to either biographical or fictionalized versions of the
subject's life.

> "While few courts have addressed
> the question of the parameters of the
> right of publicity in the context of ex-
> pressive activities, their response has
> been consistent. Whether the publication
> involved was factual and biographical or
> fictional, the right of publicity has not
> been held to outweigh the value of free
> expression." 603 P.2d 461-462 (footnotes
> omitted).

*    *    *

-17-



"It is clear that works of fiction
are constitutionally protected in the same
manner as political treatises and topical
news stories. Using fiction as a vehicle,
commentaries on our values, habits, customs,
laws, prejudices, justice, heritage and
future are frequently expressed. What
may be difficult to communicate or under-
stand when factually reported may be
poignant and powerful if offered in satire,
science fiction or parable. ... Even the
author who creates distracting tales for
amusement is entitled to constitutional
protection." 603 P.2d at 459 (citations
omitted).

\*    \*    \*

"The facts of the present case are
strikingly illustrative. Valentino was
a Hollywood star. His life and career
are part of the cultural history of an
era. As the title of respondents' film
suggests, Valentino became a "legend," a
symbol of the romantic screen idol and
lover. His lingering persona is an apt
topic for poetry or song, biography or
fiction. Whether respondents' work con-
stitutes a serious appraisal of Valentino's
stature or mere fantasy is a judgment left
to the reader or viewer, not the courts."
603 P.2d at 460.

Chief Justice Bird's comments on the "legend" of film star

Valentino as an "apt topic" for biography or fiction apply

equally to Marilyn Monroe, the subject of the present action.

The Restatement of Torts Second §652I (1977)

adopts this same position that the "false light" tort does

-18-



not survive the death of the party portrayed. And see
Justice v. Belo Broadcasting, ___ F. Supp. ___ , 4 Media
Law Reporter 2065, 2067 (N.D. Texas 1979).

The court below rested its decision on precisely
this point:

> "Although, as plaintiff contends, when
> biography departs from facts and becomes
> a work of fiction exploiting the name of
> a well-known person there is an actionable
> breach of privacy, (See Spahn v. Julian
> Messner, Inc., supra) any such claim does
> not survive death, as it is based on
> injuries to feeling, emotion, and personal
> pride, as to which 'death is a logical
> conclusion.' Factors, etc., Inc., v. Pro
> Arts, Inc., 579 F.2d 215, 221-222 (2d Cir.
> 1978)." (A 14)

Although this conclusion of the court below obviously
defeats any possible cause of action by Frosch, his appellate
brief makes no effort to  confront this point directly.
Instead, his brief first discusses (pp. 6-9) those federal
cases holding that there is a common law "right of publicity,"
including the decision in Price v. Hal Roach that such a
right of publicity is descendible.  Then, Frosch's brief
switches (pp. 9-11) to state court "false light" cases
brought by living persons under §51 of the New York Civil
Rights Law, primarily Spahn v. Julian Messner, Inc., 21 N.Y.2d

-19-

124 (1967). In an effort to confuse, Frosch's brief
(p. 10) describes the <u>Spahn</u> case as one involving "wrongful
appropriation of his [plaintiff's] right of publicity."
But it was the statutory right of privacy -- specifically
the "false light" tort under Civil Rights Law §51 -- that
was involved in <u>Spahn</u>, not the supposedly descendible
common law "right of publicity" upon which Frosch relies.*

Frosch's attorneys have not been able to point
to a single case, in this or any other jurisdiction, in
which it has been held that the representative of a de-
ceased person may maintain an action for a fictionalized
version of the deceased's life story. As with a cause of
action for libel, to which the "false light" tort is closely
allied, "death is a logical conclusion to any such claim."
<u>Factors Etc., Inc.</u> v. <u>Pro Arts, Inc.</u>, 579 F.2d 215, 221
(2d Cir. 1978).

---

*In a similar effort to confuse, Frosch's brief (p. 12)
compares the present case to <u>Youssoupoff</u> v. <u>Columbia
Broadcasting Systems</u>, Inc., 19 App. Div. 2d 865 (1st Dept.
1963) and incorrectly describes the latter as "a <u>similar
action</u> for invasion of right of privacy" (emphasis added).
<u>Youssoupoff</u>, like <u>Spahn</u> but unlike this case, was an action
under Civil Rights Law §51.

-20-



Point III:  The allegations in this case
would not establish a cause of action under
the "false light" tort even if that tort did
extend to accounts of a deceased person's
life.

Either of the above two points is sufficient,
independent of the other, to require affirmance of the
decision below.  But even if the "false light" tort did
apply to allegedly "fictionalized" accounts of a deceased
person's life, Frosch still could not succeed in the
present case.  He has previously disavowed any "false
light" claim and, in any event, the passages set forth in
Frosch's brief are legally insufficient to establish a
cause of action under the "false light" tort.

A.  Frosch disavowed any "false
light" claim.

In the papers and proceedings leading up to the
motion below, Frosch made no claim that the work at issue
had been fictionalized.  On the contrary, he insisted
that the question of the book's accuracy or inaccuracy
was irrelevant to his claim.

The Complaint does not allege that there are
any fictionalized passages in the book.  There is at most

-21-

2693

an allegation which might be understood as a half-hearted
reference to the question of fictionalization. It appears
at the beginning of paragraph 10 of the Complaint (A 19).
That paragraph, in toto, is as follows:

> "Rather than reflect an accurate
> biographical portrayal of the life of
> the decedent, the said book was inten-
> tionally designed and executed by the
> defendants to create a nostalgic media-
> image of the decedent having the potential
> for maximum commercial exploitation of
> the exclusive property right in the
> decedent's publicity possessed by the
> decedent and her estate."

It will be noted that the paragraph involves a complete
non sequitur. There is no inconsistency between factual
accuracy and commercial goals. Moreover, this vague and
half-hearted suggestion that the book might not be totally
accurate -- without supplying even a hint of what those
inaccuracies might be -- falls far short of alleging
substantial falsifications in the book. See Rosemont
Enterprises v. Random House, 58 Misc.2d 1, 5-6 (Sup. Ct. N.Y.
Cty. 1963), aff'd without opinion, 32 App. Div 2d 943 (1st
Dept. 1969); Estate of Hemingway v. Random House, Inc., 23
N.Y. 2d 341, 352 (1968).

Nor would a mere allegation of substantial fictiona-
lization be sufficient. Before a public figure (and Marilyn
Monroe was certainly a public figure -- see paragraph 5 of the

-22-

2694